1  SARAH E. BARROWS (SBN 253278)
   barrowss@gtlaw.com
2  GREENBERG TRAURIG, LLP
   Four Embarcadero Center, Suite 3000
3  San Francisco, CA 94111
   Telephone:  (415) 655-1300
4  Facsimile:  (415) 707-2010

5  Attorneys for Plaintiff
   CROSSFIT, INC.

6

7                 UNITED STATES DISTRICT COURT

8            FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10 CROSSFIT, INC.,                          CASE NO.

11            Plaintiff,
                                            COMPLAINT FOR:
12      v.                                  1. BREACH OF CONTRACT

13 REEBOK INTERNATIONAL LTD.,               2. BREACH OF COVENANT OF GOOD FAITH
                                            AND FAIR DEALING
14            Defendant.                    3. VIOLATIONS OF MASS. GEN. LAWS ch. 93A

15

16                                          JURY TRIAL DEMANDED

17

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT AND JURY DEMAND**

**INTRODUCTION**

1.  For nearly a decade, Plaintiff CrossFit, Inc. ("CrossFit") has granted Defendant Reebok International Ltd. ("Reebok") exclusive licensing rights that have breathed new life into the Reebok brand and played a critical role in helping Reebok make a long-overdue comeback.  But unbeknownst to CrossFit, Reebok has spent the bulk of its licensing relationship with CrossFit engaging in a surreptitious bait-and-switch scheme designed to systematically deprive CrossFit of millions of dollars in royalties owed under the negotiated terms of the parties' agreement.  Reebok has also breached its contractual obligations to CrossFit in a number of other ways, including, upon information and belief, by failing to meet its substantial marketing commitments, and by funneling potential customers of CrossFit-branded products to Reebok's online store in order to avoid higher royalties owed for sales on CrossFit's online store.

2.  All told, Reebok's deceptive and dishonest conduct has robbed CrossFit of the benefit of its bargain to the tune of **at least** $4.8 million in royalties and has tarnished what was once a golden opportunity for Reebok to revive its image *and* establish a long-term partnership with the highly valued CROSSFIT® brand.

3.  CrossFit and Reebok's relationship began in approximately 2010, when CrossFit entered into a license agreement with Reebok (the "Agreement").  Under the Agreement, CrossFit granted Reebok a ten-year license for the right to sell fitness apparel, footwear, and other products bearing the CROSSFIT® trademark.  Under the terms of the Agreement, Reebok was the exclusive licensee of CROSSFIT® apparel and footwear.  This meant that no one other than Reebok—including CrossFit itself—could produce clothes or shoes bearing the CROSSFIT® trademark.  In exchange for this valuable right that blocked CrossFit itself from participating in the marketing, sale, and distribution of its own branded products, Reebok agreed, among other things, to pay CrossFit royalties on net sales of

the CrossFit-branded products and to commit to marketing those products according to an annual schedule (Reebok's "marketing commitment").

4.     The relationship appeared to get off to a good start and, for two years, Reebok paid CrossFit the royalties owed under the Agreement.  In 2013, however, Reebok secretly reneged on the terms of the Agreement.  Specifically, without ever advising CrossFit, Reebok unilaterally began calculating royalties based on a fictional "wholesale equivalent price."  To be clear, the "wholesale equivalent price" was a dramatic departure from the net sales calculation Reebok and CrossFit negotiated (and which Reebok had been using for two years) because it effectively gutted the royalties Reebok owed on certain sales channels by 50%.  Reebok's wholesale equivalent price was an internal accounting figure that based royalty calculations on lower wholesale prices instead of higher retail prices, resulting in a significant reduction in royalties owed to CrossFit.  From 2013 until 2016, Reebok paid royalties based on this Reebok-friendly-but-never-before-agreed-upon "wholesale equivalent price" for all licensed products sold on the Internet.  Upon information and belief, Reebok unilaterally decided to apply this calculation method, knowing that CrossFit was unlikely to detect the underpayments due to both the rapid growth in sales of licensed products and by virtue of the fact that Reebok's royalty reports excluded whether net sales were based on wholesale prices or retail prices.

5.     In early 2016, CrossFit exercised its audit rights under the Agreement for the first time in the parties' 5-year relationship and engaged an independent third party to perform an audit of Reebok's books and records.  In an apparent effort to camouflage its underpayments, Reebok refused to provide CrossFit's auditor with critical data that the auditor requested, and which Reebok was required to provide under the Agreement.  To further conceal what it had been doing, during meetings with CrossFit and CrossFit's auditor, Reebok proposed a new royalty calculation methodology which it referred to as the "Adidas group" method.  Under the Adidas group method, Reebok would apply an increased royalty rate to wholesale prices.  Upon information and belief, proposing this "new" royalty calculation was

intended to conceal the fact that Reebok had already been using wholesale prices—without a corresponding royalty rate increase—since 2013.

6.      After receiving Reebok's second quarter 2016 royalty payment and statement, CrossFit identified numerous deficiencies in Reebok's Q2 2016 royalty report.  On August 30, 2016, CrossFit advised Reebok of these errors in an e-mail.  Reebok responded by stating to CrossFit that "the confusion lies in the fact that we have agreed with your team that the net sales definition of the contract says that we will pay 50% of net sales value for ecommerce sales."  Reebok knew this statement was false—indeed, Reebok had sat at same table with CrossFit and the auditor only six months earlier and tried to convince CrossFit to adopt this new net sales definition *because that was not* the manner in which royalties were to be calculated under the Agreement.  CrossFit refused to agree to Reebok's new definition of net sales during those early 2016 meetings or at any time thereafter.

7.      A few months later, in December 2016, and again as part of an apparent effort to conceal its prior underpayments, Reebok proposed an amendment to the Agreement that would ratify, *post hoc*, the royalty calculation method it had been employing and hiding from CrossFit.  CrossFit never agreed to the proposed amendment.

8.      In early 2017, Reebok finally acknowledged its pattern of underpayments.  In a "royalty reconciliation" document prepared by Reebok in February 2017, Reebok admitted that it had been making royalty payments "by calculating royalty at 1/2 the net sales for the eCom channel . . . ***resulting in a payment shortfall of $1.65M***" (emphasis added).  Reebok refused to make payment on this "shortfall."  However, Reebok did, for the first three quarters of 2017—and for the first time since 2012—Reebok pay royalties in accordance with the Agreement.

9.      Unfortunately, Reebok returned to its deceitful practices again a few months later when it reverted back to its concocted "wholesale equivalent price" theory in October 2017.  Moreover, not only did Reebok improperly apply its wholesale equivalent price method to e-commerce sales as it had done

from 2013 to 2016, but Reebok doubled down and began applying its wholesale equivalent price to *all* direct-to-consumer sales (i.e., *both* e-commerce *and* retail sales).

10.     In sum, Reebok paid royalties to CrossFit in accordance with the Agreement from 2010 to 2012.   Then, from 2013 to 2016, Reebok paid royalties based on its undisclosed "wholesale equivalent price" method.   After CrossFit hired an auditor, Reebok undertook a scheme to obfuscate its wrongful underpayments by refusing to produce complete data, proposing a new royalty calculation method, and falsely insisting that the parties had agreed to its wholesale equivalent price method.   After Reebok finally came clean and acknowledged an underpayment (that has never been paid) in early 2017, Reebok paid royalties in accordance with the Agreement from Q1 2017 to Q3 2017.   Yet after CrossFit's auditor raised additional questions about Reebok's payments, Reebok began applying its wholesale equivalent price calculation to even *more* sales channels.   To date, Reebok's sham royalty calculation methodology has resulted in an underpayment of at least $4.8 million in royalties, including interest.

11.     In addition to its failure to pay CrossFit royalties owed under the Agreement, upon information and belief, Reebok has failed to comply with its marketing obligations under the Agreement.   Between 2011 and 2017, Reebok was required to spend $51.75 million on marketing CrossFit-branded products and the "CrossFit Games."   Despite countless requests, Reebok has failed and refused to produce any credible evidence that it satisfied its $51.75 million marketing commitment.

12.     Reebok has also breached the Agreement in several other critical respects.   Reebok is required to keep "accurate, separate, complete and up-to-date books of account" concerning sales of CrossFit-branded products.   Yet to this day, Reebok has been unable to explain or justify the basis for the payments it has made.   Instead, Reebok has made matters more confusing by providing multiple, conflicting sets of data to CrossFit.   Reebok has not kept "accurate," "complete," and "up-to-date" books and records as required under the Agreement.

13.    Reebok has also critically failed to appropriately market and stock CrossFit-branded products on the store.crossfit.com website operated by Reebok—while at the same time promoting and fully stocking the same products on the Reebok.com website.  Reebok knows that it is obligated to pay CrossFit a higher royalty on sales through store.crossfit.com (10%) as compared to Reebok.com (5%).  Upon information and belief, by intentionally under-marketing and limiting the product offering on the store.crossfit.com site, Reebok has deprived CrossFit of the benefit of its bargain and unfairly funneled prospective customers of CrossFit-branded products to Reebok's website in an effort to promote Reebok's other products and to avoid paying higher royalty due for sales on store.crossfit.com.

14.    Reebok's deliberate decision to underpay royalties and intentional course of conduct designed to obfuscate its underpayments, coupled with its refusal to demonstrate that it has met its marketing commitments, its failure to maintain accurate books and records, and its failure to adequately market and stock goods on store.crossfit.com, constitute breaches of the Agreement and the covenant of good faith and fair dealing, as well as violations of Massachusetts General Laws ch. 93A.

## THE PARTIES

15.    Plaintiff CrossFit, Inc. is a Delaware corporation with its principal place of business at 1500 Green Hills Road, Suite 201, Scotts Valley, California.

16.    Upon information and belief, Defendant Reebok International Ltd. is a Massachusetts corporation with a principal place of business at 25 Drydock Avenue, Boston, Massachusetts.

## JURISDICTION AND VENUE

17.    This Court has subject matter over this action pursuant to 28 U.S.C. §1332 because (a) CrossFit is a Delaware corporation with its principal place of business in California and (b) Reebok is a Massachusetts corporation with its principal place of business in Massachusetts.  Therefore, complete diversity of citizenship exists.  The amount in controversy, exclusive of interest and costs, exceeds $75,000.

18.     This Court has personal jurisdiction over Reebok in California and in the Northern District of California pursuant to §410.10 of the California Code of Civil Procedure, the California Long-Arm Statute.  Upon information and belief, Reebok has chosen to and regularly solicits and does business in this judicial district with California residents and derives significant revenue or income from goods sold or services rendered in this judicial district.  By means of its e-commerce site, Reebok systematically and continuously solicits orders for its goods from and, on information and belief, ships ordered goods to, customers located throughout the United States, including in California and in this judicial district.  Reebok has purposely availed itself of the privilege of conducting business in this judicial district, thereby invoking the benefit and protection of California law.  The exercise of jurisdiction over Reebok therefore comports with traditional notions of fair play and substantial justice.

19.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to CrossFit's claims occurred in this judicial district, Reebok conducts substantial business in this judicial district, and because Reebok is otherwise subject to personal jurisdiction in this judicial district.

### INTRADISTRICT ASSIGNMENT

20.     Assuming the intradistrict assignment requirement applies to this matter, a substantial amount of the acts complained of herein were committed in Scotts Valley, Santa Cruz County, California, so that assignment to the San Jose division of this district is appropriate.

### FACTUAL ALLEGATIONS

**A.     CrossFit**

21.     Developed in the early 1980s, CrossFit is a popular brand of fitness training that helps individuals improve their physical well-being and cardiovascular fitness in an encouraging environment. CrossFit defines its fitness training program as "constantly varied functional movements performed at a

relatively high intensity." In addition to its unique fitness training regimen, CrossFit sells products and offers numerous services under the CrossFit brand.

22.     Over the last three decades, CrossFit has worked diligently and invested substantial resources in promoting the CROSSFIT® brand. CrossFit's hard work to promote its brand has paid off. More than 15,000 gyms across the world are licensed CrossFit affiliates; CrossFit's website averages nearly 80 million hits per year; and the "CrossFit Games," which are televised on CBS, draw tens of thousands of participants and hundreds of thousands of viewers each year.

23.     CrossFit's careful cultivation, maintenance, and protection of its intellectual property rights has enabled CrossFit to amass considerable goodwill, and the CrossFit name is widely recognized around the world. Consumers readily and singularly associate the CrossFit name with CrossFit's business and services. CrossFit owns seven federal trademark and service mark registrations for the word mark CROSSFIT®, including registrations for fitness training, charitable fundraising, scientific research relating to exercise and human performance, entertainment services (e.g., videos and podcasts), clothing, and footwear.

**B.     Reebok**

24.     Upon information and belief, Reebok is an athletic footwear and apparel company. Once the leader in the athletic footwear market—ahead, even, of industry titan Nike—Reebok fell from the collective consumer consciousness in the 1990s.

25.     After an acquisition of Reebok by Adidas in 2005, the CEO of Adidas was candid in warning shareholders of the long road to Reebok's brand recovery, acknowledging that Reebok must become "more relevant to consumers." Upon information and belief, to accomplish that goal, Reebok embarked upon a strategy to attract millennials. A critical component of its strategy was a partnership with CrossFit.

**C.      The Exclusive License Agreement**

26.      On September 25, 2010, CrossFit and Reebok entered into the Agreement.  A copy of the Agreement, as amended, is attached hereto as **Exhibit A**.  Under the Agreement, CrossFit granted a license to Reebok for the right to manufacture, sell, and distribute fitness apparel, footwear, and other products bearing the CROSSFIT® mark.  *See* Ex. A.  The Agreement was subsequently amended on March 3, 2011, September 19, 2012, and July 3, 2014.  *See id.*  All agreements or modifications to the Agreement are required to "be made in writing and signed by both parties."  *Id.* §20.7.

27.      The term of the Agreement is ten years, commencing on September 25, 2010 and continuing until December 31, 2020.  *id.* §18.1.

28.      The Agreement provides that Reebok is obligated to pay CrossFit a quarterly royalty on the "Net Sales for all Licensed Products."  *Id.* §§2.1, 7.1, 9.1.  "Licensed Products" are defined as products "manufactured by or on behalf of Reebok and branded with the CrossFit Trademarks and the Reebok Trademarks for the purpose of sale in accordance with this Agreement."  *Id.* §1.1.

29.      "Net Sales" is defined as "the invoiced selling price of the Licensed Products solely less (i) actual and documented customer returns and taxes, and (ii) chargebacks solely related to the Licensed Products taken in the normal course of business and which are separately stated on an invoice or credit memo."  *Id.* §9.1.

30.      The meaning of "Net Sales" as defined by the Agreement is clear and unambiguous:  it is the "invoiced selling price of the Licensed Products," less certain deductions.  It is the price that a third party pays to Reebok, whether that third party is an end customer, wholesaler, or distributor.

31.   Royalty rates owed to CrossFit under the Agreement are as follows:

| Product | Sales Channel | Royalty Rate | Agreement |
|---------|---------------|--------------|-----------|
| Performance Category | store.crossfit.com | 10% | §7.1 |
| | Other than store.crossfit.com | 5% | §9.1 |
| Lifestyle Category | All | 10% | §9.1 |
| Open Category | All | 10% | §9.1 |
| CrossFit Games Apparel | All | 10% | §9.1 |
| Reebok Products | Click-through from store.crossfit.com to reebok.com | 5% | §7.1 |

Reebok is required to make royalty payments and provide an accompanying royalty statement within 45 days after the end of each calendar quarter.  *Id. §9.4.*  Each statement is required to include, "on a sku by sku basis, and to the extent reasonably available to Reebok, sales volume, territory and channel of distribution for such sales."  *Id.*

32.   The Agreement provides that Reebok's license is exclusive as to clothing, headgear, and footwear.  *Id. §2.1.1.*  Reebok's license is non-exclusive as to "Open Category Products" and as to goods made of leather or imitations of leather.  *Id. §§2.1.1, 2.1.2.*

33.   Under the Agreement, Reebok is required to spend certain enumerated amounts for "marketing and activation" in connection with the Licensed Products, the CrossFit Games, and other programs.  *Id. §8.5.*  Reebok's annual marketing and activation obligation, as amended on July 3, 2014, is as follows:

| 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|------|------|------|------|------|------|------|------|------|------|
| $4.0M | $6.6M | $7.7M | $7.05M | $7.9M | $8.8M | $9.7M | $10.6M | $11.5M | $12.4M |

*Id.*  Reebok is required to spend no less than 80% of its annual marketing commitment with "unaffiliated third parties for traditional media purchases and related creative (i.e., print, online, television, radio, point of purchase/retail, etc.)" and no more than 20% of its annual marketing commitment on "production for marketing and activation programs."  *Id. §8.6.*  In addition, Reebok is obligated under the Agreement to provide CrossFit, for CrossFit's review and comment, a proposed marketing,

9

advertising, and public relations plan reflecting the marketing and activation commitments set forth in the Agreement. *Id.*

34.     The Agreement provides that "time is of the essence regarding all payments due" under the Agreement, and that "any and all delinquent payments" shall accrue interest charges at a rate of 1.5% per month. *Id.* §9.6.

35.     The Agreement requires Reebok to keep and maintain "accurate, separate, complete and up-to-date books of account stating, by code or other clear means, records of all sales of the Licensed Products." *Id.* §9.5.  Once a year, CrossFit or its authorized representative has the right to inspect or audit all such records, and "shall have free and full access thereto." *Id.*  If an inspection or audit reveals that Reebok has understated or underpaid its obligations under the Agreement, Reebok is required to "immediately pay to CrossFit the balance of all such amounts found to be due pursuant to such audit or inspection," subject to interest charges. *Id.*  In addition, if the audit reveals that Reebok understated or underpaid its obligations under the Agreement by 5% or more, then Reebok is required to pay for the cost of the inspection or audit. *Id.*

36.     Under the Agreement, Reebok agreed to "assume sole responsibility, at its sole cost and expense, for the operation, hosting, maintenance, quality assurance, technical operation . . . technical support, order processing and fulfillment . . . of CrossFit's on-line store at http://store.crossfit.com," referred to in the Agreement as the "On-Line Store." *Id.* at §7.1.

37.     The Agreement is governed by New York law. *Id.* at §20.10.  It requires the parties to submit any disputes they cannot resolve in good faith to non-binding mediation.  If mediation is brought by Reebok, the mediation is to be conducted in California; if mediation is brought by CrossFit, the mediation is to be conducted in Massachusetts. *Id.*

**D.    Reebok's Partnership with CrossFit Enables Reebok's Brand to "Turn the Corner."**

38.    The right to associate itself with CrossFit in the minds of consumers and to use the CROSSFIT® trademark has been critical to Reebok, a company that had lost relevance in the years before the Agreement was signed in 2010.  As Reebok executives have publicly acknowledged, CrossFit's impact on Reebok has been "profound," and has enabled Reebok's brand to "turn the corner."

**E.    Reebok Refuses to Provide Data in Connection with E&Y Audit**

39.    In late 2015, CrossFit exercised its audit right under the Agreement and engaged the independent accounting firm Ernst & Young ("E&Y") to perform a royalty audit and compliance review.

40.    Despite multiple requests for documents required to be provided under §9.5 of the Agreement, Reebok failed to provide E&Y with information necessary to complete its audit.

**F.    Reebok's Proposal to Adopt the "Adidas Group" Method for Calculating Royalties**

41.    On February 29, 2016 and March 1, 2016, E&Y, along with two CrossFit representatives, met with Reebok.  During the meetings, Reebok advised CrossFit that it wished to change the manner in which royalties were calculated under the Agreement.  Instead of the royalty calculation method set forth in the Agreement, Reebok proposed to use the method of its parent company, Adidas.  Reebok referred to this royalty calculation method as the "Adidas group" method.  Under the Adidas group method, the parties would base royalty calculations on wholesale prices instead of end customer prices.  Recognizing that this would result in a lower royalty to CrossFit (because wholesale prices are lower than retail prices), Reebok acknowledged that the applicable royalty rates would need to be increased.

42.    Notwithstanding these preliminary discussions about changing the royalty calculation method under the Agreement, the parties never agreed to make the change, nor did they execute a written amendment signed by both parties, as required under the Agreement.

43.     Remarkably, what Reebok never told CrossFit during these meetings in early 2016 was that Reebok was *already* paying CrossFit royalties for e-commerce sales based on wholesale equivalent prices instead of on end customer prices—without any corresponding increase in the applicable royalty rate.  Based on this undisclosed method for calculating royalties that Reebok had unilaterally adopted and CrossFit never knew about until early 2017 and never agreed to at any time, Reebok had been underreporting and underpaying royalties to CrossFit since 2013.

**G.     Reebok's Failure to Make Full Q2 2016 Royalty Payment**

44.     Upon receipt of Reebok's second quarter 2016 royalty statement, CrossFit identified certain errors and inconsistencies in Reebok's royalty calculation.   On August 30, 2016, CrossFit advised Reebok of these errors.  On September 23, 2016, Reebok responded, stating, in pertinent part, as follows:

> [The calculations are] accurate based upon our view of the contract.  The confusion lies in the fact that we have agreed with your team that the net sales definition of the contract says that we will pay 50% of net sales value for ecommerce sales.

Attached hereto as **Exhibit B** is a true and accurate copy of CrossFit's August 30, 2016 e-mail and Reebok's September 23, 2016 response.

45.     This statement was false.  The parties had never agreed that royalties would be based on 50% of net sales for e-commerce sales.  CrossFit promptly responded that it had never agreed to any change in the royalty calculation method—much less signed an amendment to the Agreement reflecting such a fundamental change in the parties' contract.

**H.     Reebok Proposes Amendment to Definition of "Net Sales" in Agreement**

46.     In December 2016, Reebok approached CrossFit with a proposal to amend the Agreement.   In addition to extending the term to 2025 and eliminating Reebok's marketing commitments, Reebok sought to revise the definition of "Net Sales" as follows:

- o  **Net Sales**" means "Net Sales Wholesale" plus "Net Sales Own Retail and Online".
- o  "Net Sales Wholesale" means the gross revenues in U.S. dollars from all sales of Licensed Products as invoiced by LICENSEE (or its affiliates and sub-licensees, each to the extent permitted hereunder) to third party customers, and reduced only by excise or indirect taxes (e.g. VAT and turnover taxes), returns as credited to third party customers, usual cash, trade and sales discounts and allowances, insurance and freight out (if invoiced separately)  "Net Sales Wholesale" does not include "Net Sales Own Retail and Online" and sales to the WCH Entities or their affiliates.
- o  "Net Sales Own Retail and Online" means 50% of the gross revenues received from all sales of Licensed Products by LICENSEE or its affiliates to consumers via own-retail (whether in a physical store or online) and reduced only by discounts, rebates, excise or indirect taxes (e.g., VAT and turnover taxes) and returns.

Attached hereto as **Exhibit C** is a true and correct copy of a December 14, 2016 e-mail attaching a term sheet containing proposed amendments to the Agreement.

**I.      Reebok's 2017 Royalty Reconciliation**

47.    In a document Reebok provided to CrossFit entitled "Reebok x CrossFit Royalty Reconciliation February 2017," Reebok acknowledged that "[a]ctual royalty payments have been made by calculating royalty at 1/2 the net sales for the eCom channel . . . *[r]esulting in a payment shortfall of $1.65M*" (emphasis added).  Attached hereto as **Exhibit D** is a true and accurate copy of the February 2017 reconciliation document.  In other words, if Net Sales were $100 for a pair of shoes sold through store.crossfit.com—to which a 10% royalty would apply under the Agreement—Reebok had been paying CrossFit $5.00 instead of $10.00, resulting in a "payment shortfall" of $5.00.  Reebok has never paid any portion of the $1.65 million "payment shortfall" identified in February 2017.

48.    After Reebok provided the reconciliation document in February 2017, Reebok began paying royalties in accordance with the definition of Net Sales in the Agreement for the first time since 2013.

**J.      CrossFit Engages KPMG to Perform Audit**

49.    To confirm the accuracy of royalty payments under the Agreement, CrossFit engaged KPMG LLP ("KPMG") in July 2017 to assess Reebok's compliance with the Agreement.  KPMG

attempted to conduct its compliance review in the second half of 2017. Reebok failed and refused to provide certain requested information to KPMG, despite its obligation to do so under the Agreement. Nevertheless, KPMG made numerous findings based on the information available, some of which were shared with Reebok.

50. Upon information and belief, Reebok disagreed with certain of KPMG's findings. After learning of KPMG's findings, Reebok made royalty payments for Q4 2017 and Q1 2018 based on 50% of net sales for all "direct-to-consumer" channels. In other words, whereas Reebok had been improperly making payments on 50% of net sales for only the *e-commerce* channel between 2013 and 2016, beginning in Q4 2017, Reebok improperly made payments on 50% of net sales for *both* the e-commerce *and* retail channels. This new calculation methodology resulted in an underpayment of approximately $587,000 for Q4 2017 and an underpayment of approximately $500,000 for Q1 2018.

**K.   Reebok's Royalty Payments to Date**

51. In total, Reebok has underpaid royalties due CrossFit by at least $4.8 million, including interest.

52. CrossFit's underpayment figure of $4.8 million is only an estimate, however, as there is not a single year between 2013 and the present for which the various versions of net sales data that Reebok has provided to CrossFit is consistent. The net sales information in Reebok's quarterly royalty reports varies in significant respects from the net sales information Reebok provided to CrossFit in February 2017 after Reebok disclosed it had been concealing its wholesale pricing method. And the net sales information Reebok provided to KPMG in late 2017 differs from both the royalty reports and the February 2017 data sets.

**L.   Reebok's Failure to Demonstrate Compliance with Its Marketing Commitment**

53. Despite numerous requests, Reebok has refused to provide information that would demonstrate whether Reebok has complied with its marketing commitment under the Agreement.

54.     The Agreement requires Reebok to spend a total of $86.25 million over the ten-year term of the Agreement on "marketing and activation" in connection with the Licensed Products, the CrossFit Games, and other programs.  Ex. A §8.5.  Through 2017, Reebok's marketing commitment was $51.75 million.  *Id.*

55.     In order to validate Reebok's compliance with its marketing commitment obligation, KPMG requested the details of Reebok's marketing, promotion, and advertising expenses for the period September 25, 2010 to June 30, 2017.  While Reebok provided KPMG with certain marketing expenditure information for 2016 and 2017 and a summary of its marketing spend for 2015, Reebok failed to provide details of its marketing spend for 2011 to 2015.  Moreover, the information Reebok *did* provide for 2015 to 2017 only raised more questions than it answered, including, for example, whether Reebok complied with its contractual obligation to spend a minimum of 80% of its commitment on traditional media purchases.

56.     In advance of filing this lawsuit, CrossFit requested that Reebok provide evidence of its annual marketing spend in order to evaluate Reebok's compliance with the Agreement.  Reebok has refused to provide the requested information.

57.     Based upon the limited information provided by Reebok to KPMG, CrossFit has reason to believe that Reebok failed to meet its marketing commitments.

58.     To the extent Reebok has failed to comply with its obligations under §§8.5 and 8.6 of the Agreement, CrossFit has suffered (and will continue to suffer) significant harm.  The very reason CrossFit bargained to obtain a nearly $90 million marketing commitment from Reebok is because marketing leads to sales, brand recognition, and increased brand value.  Reebok's failure to comply with its marketing obligations has, upon information and belief, resulted in lost royalties, lost brand value, and lost profits.

**M.    Reebok Fails to Adequately Market, Maintain, and Operate CrossFit Website**

59.    The Agreement requires Reebok to pay a higher royalty to CrossFit for sales of "Performance Category" products sold through the store.crossfit.com site (10%) than through the reebok.com site (5%). Upon information and belief, in order to reduce its royalty payments to CrossFit and to funnel prospective customers of CrossFit-branded products to Reebok's website, Reebok has failed to adequately market, operate, and maintain the store.crossfit.com website, including, without limitation, by failing to sufficiently stock products for sale on store.crossfit.com.

60.    The industry standard for "instocks" for an online store is 90-95% for non-clearance items. This is because without a robust assortment of styles and sizes available for customers to purchase online, sales potential is reduced, and customer experience is negatively impacted. In June 2016, the instock percentage for non-clearance items on store.crossfit.com was 69.94%, far below the industry standard. Despite raising this issue with Reebok, in December 2017, the instock percentage for the CrossFit store website was only 80.00%—again, substantially below the industry standard. CrossFit repeatedly advised Reebok about the understocking issue, but Reebok refused to take action.

61.    Reebok recently reported to CrossFit that sales at store.crossfit.com have fallen 44% compared to last year, while sales at reebok.com have remained flat. This data suggests that Reebok understocked and/or did not adequately market CrossFit's online store with the intent to drive traffic to reebok.com, to boost Reebok's own sales, and to avoid paying CrossFit the full 10% on Performance Category sales.

**N.    Mediation Is Unsuccessful**

62.    After working in good faith to settle the parties' dispute, CrossFit submitted the dispute to non-binding mediation in accordance with §20.10 of the Agreement. The parties were unable to resolve their dispute through mediation.

## CAUSES OF ACTION

### COUNT I
**(Breach of Contract)**

63.     CrossFit re-alleges and incorporates by reference all of the allegations contained in Paragraphs 1 through 62 above as if fully set forth herein.

64.     CrossFit and Reebok entered into an enforceable agreement under the terms of which CrossFit granted Reebok an exclusive license to manufacture, sell, and distribute fitness apparel, footwear, and other products bearing the CROSSFIT® trademark.  In exchange for these valuable rights, Reebok agreed, *inter alia*, to pay CrossFit royalties based on the net sales of all Licensed Products and to spend certain specified amounts for marketing in connection with the Licensed Products and the CrossFit Games.

65.     Reebok breached the Agreement by, among other things, underpaying royalties owed to CrossFit; failing to satisfy its marketing commitments; failing to provide a marketing plan for CrossFit's review and comment; failing to adequately operate, maintain, and assure the quality of the store.crossfit.com website; failing to provide adequate order processing and fulfilment through the store.crossfit.com website; failing to sufficiently market the store.crossfit.com website; failing to pay CrossFit for the cost of the E&Y and KPMG audits; and failing to keep accurate, separate, complete, and up-to-date books and records.

66.     CrossFit has performed all of its obligations under the Agreement, and is ready, willing, and able to perform its remaining obligations under the Agreement.

67.     As a direct result of Reebok's breaches of the Agreement, CrossFit has and will continue to suffer monetary damages for which Reebok is liable, together with interest, costs, and attorneys' fees.

68.     In the event it is determined that CrossFit has no adequate remedy at law with respect to Reebok's breach of its marketing commitment obligations, and in the alternative, CrossFit will have suffered (and will continue to suffer) irreparable harm if Reebok does not comply with those

obligations.   Accordingly, as an alternative to monetary damages, CrossFit is entitled to specific performance of §§8.5 and 8.6 of the Agreement.

## COUNT II
### (Breach of Covenant of Good Faith and Fair Dealing)

69.     CrossFit re-alleges and incorporates by reference all of the allegations contained in Paragraphs 1 through 68 above as if fully set forth herein.

70.     The Agreement is governed by and construed under the laws of the State of New York, which imputes a covenant of good faith and fair dealing in every contract.

71.     Reebok's conduct as set forth above constitutes one or more breaches of the covenant of good faith and fair dealing.

72.     As a direct result of Reebok's breaches of the covenant of good faith and fair dealing, CrossFit has and will continue to suffer monetary damages for which Reebok is liable, together with interest, costs, and attorneys' fees.

## COUNT III
### (Violations of Mass. Gen. Laws ch. 93A, §§ 2, 11)

73.     CrossFit re-alleges and incorporates by reference all of the allegations contained in Paragraphs 1 through 72 above as if fully set forth herein.

74.     Reebok is engaged in trade or commerce.

75.     The acts and omissions of Reebok, as alleged above, constitute unfair and deceptive acts or practices in violation of Chapter 93A.

76.     Reebok's violations of Chapter 93A were knowing and willful.

77.     As a direct and proximate result of Reebok's unfair and deceptive acts and practices, CrossFit has incurred significant and unreimbursed costs and expenses.

**PRAYER FOR RELIEF**

**WHEREFORE**, CrossFit prays for judgment against Reebok as follows:

a.      As to Count I, enter judgment in favor of CrossFit and award CrossFit monetary damages in an amount to be determined against Reebok, together with interest, costs, attorneys' fees, and other amounts under applicable law;

b.      In the alternative, as to Count I, enter judgment in favor of CrossFit for specific performance, and order Reebok to fully satisfy any unmet obligations, including but not limited to marketing expenditures required under §§8.5 and 8.6 of the Agreement;

c.      As to Count II, enter judgment in favor of CrossFit and award CrossFit monetary damages in an amount to be determined against Reebok, together with interest, costs, attorneys' fees, and other amounts under applicable law;

d.      As to Count III, enter judgment in favor of CrossFit and award CrossFit monetary damages, including treble damages, in an amount to be determined against Reebok, together with interest, costs, attorneys' fees, and other amounts under applicable law;

e.      That CrossFit recover all taxable costs of this action, including reasonable attorneys' fees and both pre- and post-judgment interest, pursuant to California Code of Civil Procedure § 1021.5, and other applicable laws;

f.      That CrossFit be awarded punitive damages in view of Reebok's wanton and deliberate unlawful and unfair acts committed with oppression, fraud and malice;

g.      That CrossFit be awarded such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), CrossFit demands a jury on all issues triable by a jury.

Dated: June 14, 2018

Respectfully submitted,

CROSSFIT, INC.,
By its attorneys,


/s/ *Sarah E. Barrows*
SARAH E. BARROWS (SBN 253278)
barrowss@gtlaw.com
GREENBERG TRAURIG, LLP
Four Embarcadero Center, Suite 3000
San Francisco, CA 94111
Telephone: (415) 655-1300
Facsimile: (415) 707-2010

# EXHIBIT A

## LICENSE AND SPONSORSHIP AGREEMENT

**THIS AGREEMENT**, effective as of September 25, 2010 ("**Effective Date**"), is entered into by and between **REEBOK INTERNATIONAL LTD.**, a Massachusetts corporation having its principal place of business at 1895 J.W. Foster Blvd., Canton, Massachusetts 02021 ("**RIL US**") and Reebok International Limited, a corporation organized under the law of the United Kingdom having its principal place of business at 4th Floor 11-12 Pall Mall, London SW1Y SLU England ("**RIL UK**" and, together with **RIL US**, hereinafter referred to collectively as "**Reebok**") and **CROSSFIT, INC.**, a Delaware corporation having its principal place of business at 1250 Connecticut Avenue NW, Suite 200, Washington, D.C. 20036 ("**CrossFit**").

**WHEREAS** Reebok is an industry leader in the fields of fitness apparel, footwear and accessories and has a legacy of leadership in the field of fitness equipment and programming;

**WHEREAS** CrossFit has developed a strength and conditioning program, including the CrossFit Journal, CrossFit Kids program, seminars, courses and certifications consisting, in part, of constantly varied, high-intensity, functional movements with, in some cases, an implementation of fitness as sport (the "**CrossFit Program**");

**WHEREAS,** CrossFit also conducts, at a local, regional and global level, fitness games or events based upon the CrossFit Program;

**WHEREAS** Reebok and CrossFit wish to work together to further expand the CrossFit Games and the CrossFit Program and increase the number of affiliated facilities worldwide, thereby elevating CrossFit as a global brand while at the same time reinforcing Reebok's authenticity in the world of fitness;

**WHEREAS** Reebok wishes to become the title sponsor of the CrossFit Games and CrossFit wishes to grant Reebok that sponsorship; and

**WHEREAS** Reebok desires to obtain from CrossFit, and CrossFit desires to grant to Reebok, a license to manufacture, sell, and distribute fitness apparel, footwear, and other products bearing the CrossFit name and trademarks;

**NOW THEREFORE**, in consideration of the premises and the covenants hereinafter recited, the parties hereto agree as follows:

## 1. DEFINITIONS AND INTERPRETATION

    **1.1**   **Definitions**. As used in this Agreement, the terms below shall have the following definitions:

"**Affiliate**" shall mean with respect to a specified Person, any Person that directly or indirectly controls, is controlled by, or is under common control with, the specified Person. As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract, license or otherwise. For the avoidance of doubt, "Affiliate", as a capitalized term, shall not refer to CrossFit Gym(s), which are commonly referred to as "affiliates";

1

"**Confidential Information**" shall mean confidential or non-public business information including without limitation, ideas, formulae, plans, proposals, designs, schematics, drawings, flow charts, product and process specifications, trade secrets, know-how, technical data, algorithms, databases, and technical reports, and customer, marketing and financial information; embodied in any form or medium and owned or developed by or on behalf of a party or acquired from its licensors with rights to disclose or sublicense that pertains to a party's business;

"**CrossFit Games**" means collectively the Global CrossFit Games, Regional CrossFit Games feeding into the Global CrossFit Games and Sectional CrossFit Games feeding into the Regional CrossFit Games (if any);

"**CrossFit Gyms**" means the loosely linked network of fitness facilities, each under a license from CrossFit to an individual to operate one fitness facility, using the CrossFit trademarks and methodologies and commonly referred to as CrossFit affiliates, a partial list of which may be set forth at http://www.crossfit.com/cf-affiliates/ (or on any successor URL) and as may from time to time be updated;

"**CrossFit License**" shall have the meaning set forth in Section 11.1;

"**CrossFit Marketing Materials**" means all advertising, marketing, and other materials created by CrossFit or by a third party on behalf of CrossFit to promote the CrossFit Program, CrossFit Gyms, CrossFit Games, CrossFit Trademarks, CrossFit affiliation program, Application, any other CrossFit fitness event or contest, program, product or service, and any other goods or services contemplated by this Agreement. For clarity, CrossFit Marketing Materials expressly excludes the Product Promotion Materials (other than the CrossFit Trademarks) and any underlying Reebok Property described or used therein.

"**CrossFit Program**" shall have the meaning set forth in the recitals;

"**CrossFit Property**" means the CrossFit Program, CrossFit Gyms, CrossFit Games, CrossFit Trademarks, CrossFit affiliation program, Application, CrossFit Projects, CrossFit Marketing Materials, any other CrossFit program, product or service, as well as any documentation, modifications, improvements, enhancements, updates or derivative works related to or made to any of the foregoing (including without limitation workout descriptions, methodologies, assessment materials, and training, nutrition and health guides and manuals), any portion thereof, and any documentation pertaining thereto and all Intellectual Property Rights in the foregoing; *provided that* "CrossFit Property" expressly excludes (i) Reebok Property and (ii) any works, inventions, or other materials that are deemed by applicable law to be unprotectible or in the public domain.

"**CrossFit Trademarks**" means those registered and unregistered trademarks, service marks, logos, trade dress, trade names, and other source identifiers owned by CrossFit, including, without limitation, those identified in **Schedule A** hereto, as amended from time to time by CrossFit by notice to Reebok; *provided, however,* that CrossFit will not remove any items from **Schedule A** without Reebok's prior consent, which consent will not be unreasonably withheld or delayed.

"**CrossFit Trainers**" shall have the meaning set forth in Section 5.2;

"**Exclusively Branded Products**" shall have the meaning set forth in Section 2.1.1 hereto;

"**Exploit**" (and as applicable, "**Exploitation**") means to manufacture (directly or indirectly), package, import, export, offer for sale, sell, advertise, promote, ship and distribute;

**"Global CrossFit Games"** means the annual championship CrossFit fitness games at which qualifiers from the Regional CrossFit Games compete in a multi-day event, currently held in July at The Home Depot Center in Los Angeles, California;

**"Intellectual Property Rights"** means any and all now known or hereafter known tangible and intangible (i) rights associated with works of authorship including, without limitation, copyrights, moral rights and mask-works, (ii) trademarks, service marks, logos, trade dress, and trade name rights and similar rights, (iii) trade secret rights, (iv) patents, designs, algorithms and other similar rights, (v) all other intellectual property and proprietary rights of every kind and nature and however designated, whether arising by operation of law, contract, license or otherwise, including any software, know-how, development tools, techniques or any other proprietary material or information, and (vi) all registrations, initial applications, renewals, extensions, continuations, divisions or reissues thereof now or hereafter made, existing, or in force (including any rights in any of the foregoing).

**"Licensed Products"** means the products identified in **Schedule C** as amended from time to time in writing by mutual agreement of the parties, manufactured by or on behalf of Reebok and branded with the CrossFit Trademarks and the Reebok Trademarks for the purpose of sale in accordance with this Agreement;

**"Net Sales"** shall have the meaning set forth in Section 9.1;

**"On-line Store"** shall have the meaning set forth in Section 7.1.

 **"Open Category Products"** shall have the meaning set forth in Section 2.1.2 hereto;

**"Person"** means any individual, partnership, company, firm, corporation, trust, association, unincorporated organization or similar entity;

**"Reebok Competitors"** means those entities and/or brands set forth on **Schedule D,** as may be amended from time to time by mutual written agreement of the parties;

**"Reebok License"** shall have the meaning set forth in Section 2.1;

**"Reebok Marketing Materials"** means all advertising, marketing, and other materials created by Reebok or by a third party on behalf of Reebok to promote Licensed Products, the CrossFit Games, CrossFit Reebok Gyms, and any other goods or services contemplated by this Agreement (including without limitation Product Promotion Materials and Reebok Footage). For clarity, Reebok Marketing Materials expressly excludes the CrossFit Footage (other than the Reebok Trademarks) and any underlying CrossFit Property described or used therein;

**"Reebok Products"** means all products and services (including, without limitation, fitness and training programs and equipment, whether or not used at a CrossFit Reebok Gym) created by or on behalf of Reebok and its Affiliates independent of, and not based on, a derivative of or incorporating, CrossFit, any proprietary elements of the CrossFit Program or any CrossFit Intellectual Property Rights;

**"Reebok Property"** means the Reebok Trademarks, Reebok Products, Licensed Products, Games Apparel, Athlete Bags, Official Gear, Fan Gear, Reebok Marketing Materials, all other merchandise created by Reebok pursuant to this Agreement, and all documentation, modifications, improvements, enhancements, updates, and derivative works related to or made to any of the foregoing, any portion thereof, and any documentation pertaining thereto (including without limitation all artwork, packaging, and hang tags used in connection with Licensed

3

Products) and all Intellectual Property Rights in the foregoing; *provided that* "Reebok Property" expressly excludes (i) CrossFit Trademarks, and (ii) any works, inventions, or other materials that are deemed by applicable law to be unprotectible or in the public domain.

"**Reebok Trademarks**" means those registered and unregistered trademarks, service marks, logos, trade dress, trade names, and other source identifiers owned or duly licensed from a third party by Reebok and its Affiliates including, without limitation, those identified in **Schedule B** hereto, as amended from time to time by Reebok by notice to CrossFit. For clarity, Reebok may, in its sole discretion, create new trademarks, service marks, logos, slogans, and other source identifiers which incorporate one or more CrossFit Trademarks (the "**New Reebok Logos**") to be used on Licensed Products in connection with this Agreement, but subject to CrossFit's approval rights described herein. Such New Reebok Logos will be deemed to be two separate trademarks used together: (i) the applicable CrossFit Trademark(s) will be deemed a CrossFit Trademark under this Agreement, and (ii) all other elements (including Reebok Trademarks and any graphic elements) will be deemed Reebok Trademarks under this Agreement upon Reebok adding them to Schedule B by notice to CrossFit. After the Term, Reebok will continue to own and will be free to use any portions of the New Reebok Logo other than the CrossFit Trademark(s) contained therein;

"**Regional CrossFit Games**" means the annual CrossFit fitness games at which qualifiers from the Sectional CrossFit Games (or other CrossFit-determined qualification) compete for the right to participate in the Global CrossFit Games;

"**Sectional CrossFit Games**" means the annual CrossFit fitness games, events, workouts or series of workouts, as solely determined by CrossFit, at or during which athletes compete for the right to participate in the Regional CrossFit Games; and

"**Territory**" means worldwide.

## 2. LICENSED PRODUCT LICENSE

2.1 <u>Reebok License</u>. During the Term, subject to the terms and conditions of this Agreement, CrossFit hereby grants to Reebok a limited, non-transferable, sublicenseable license to Exploit, either directly or via sublicense, the CrossFit Trademarks on Licensed Products for sale in the Territory (the "**Reebok License**"). Such right to Exploit includes but is not limited to the right to distribute the Performance Category of Licensed Products to Reebok's distributors for the purpose of retail resale to consumer end users.

2.1.1 <u>Exclusively Branded Products</u>. Except as otherwise provided herein, the Reebok License shall be exclusive as to all products set forth on <u>Schedule C(i)</u> hereto, other than Open Category Products (as defined below) (the "**Exclusively Branded Products**"). The Reebok License shall be non-exclusive as it relates to all products set forth on Schedule C(ii) hereto.

2.1.2 <u>Open Category Products</u>. The Reebok License shall be non-exclusive in respect of apparel, merchandise and accessories produced by individual CrossFit Gyms solely in connection with promotion of such individual CrossFit Gym (i.e., the individual CrossFit Gym's name is prominently displayed on the product) and sold by or on behalf of that CrossFit Gym (the "**Open Category Products**"). Furthermore, CrossFit, through modification of its agreements with the CrossFit Gyms, shall, within a reasonable period of time, but no later than December 31, 2011, and taking into consideration the CrossFit affiliation and license renewal

4

process, prohibit any CrossFit Gym which produces Open Category Products from (i) developing and selling a line of performance apparel using the CrossFit Trademarks and/or (ii) including the logo or name of any Reebok Competitor on such Open Category Products.

**2.2** Compliance.    Reebok shall comply with CrossFit's written guidelines and other written instructions timely provided to Reebok on proper usage of the CrossFit Trademarks (the "**CrossFit Usage Guidelines**") and with all applicable laws with respect to printing and placement of proper notice of the CrossFit Trademarks on all packaging and advertising, marketing and promotional material created by Reebok; provided that CrossFit shall provide written notice to Reebok with respect to any change in such CrossFit Usage Guidelines and shall provide Reebok with a reasonable period of time to comply considering the relevant circumstances.

**2.3** Reserved Rights.

2.3.1    CrossFit reserves all rights not expressly granted to Reebok hereunder.

2.3.2    CrossFit shall not be prevented from granting third parties the right to use the CrossFit Trademarks in any manner whatsoever, except as otherwise expressly provided herein.

## 3. CROSSFIT REEBOK AFFILIATE GYMS

**3.1** CrossFit Reebok Affiliate Gym License.    Subject to the terms and conditions of this Agreement, CrossFit hereby agrees to allow, throughout the Territory, subject to ongoing compliance with CrossFit's then current affiliate program license agreement, rules and regulations, including timely payment of affiliate fees, co-branded CrossFit Reebok gyms (such branding, logo(s) and co-branded gym name to be mutually agreed upon), which shall be owned and operated, in each instance, by an individual approved by CrossFit (which approval shall not be unreasonably withheld) and who has satisfied CrossFit's then-current uniformly applied criteria for affiliating and operating a CrossFit Gym (i.e., current requirement includes obtaining and maintaining a CrossFit Level One certification in good standing) (the "**CrossFit Reebok Gyms**"). In addition:

3.1.1    Reebok shall provide such individual affiliate-operator a limited license to use the Reebok name and logo in connection with the CrossFit Reebok Gym.

3.1.2    Reebok may revoke such Reebok license in its sole and absolute discretion, but CrossFit shall determine, in its sole and absolute discretion, whether such affiliate-operator is in good standing with CrossFit and whether he or she may continue to operate a CrossFit affiliated gym whether or not such gym is co-branded as described herein; *provided, however*, that CrossFit may not revoke such affiliate-operator's affiliation prior to Reebok's revocation of the license without: (i) first providing Reebok with the basis for such revocation; and (ii) providing Reebok with a reasonable period in which to either work with the affiliate-operator to cure any defaults under the then current and uniformly applied CrossFit criteria or, if possible, find a replacement affiliate-operator acceptable to CrossFit in accordance with Section 3.1.

3.1.3    Each such CrossFit Reebok Gym will be treated as an affiliated gym on a level equal to other CrossFit Gyms.

3.1.4 In the event CrossFit reasonably requests, Reebok will use reasonable efforts to encourage each such CrossFit Reebok Gym to cooperate with CrossFit in connection with CrossFit's fitness, nutrition and health information and/or data collection and analysis projects or initiatives (the "**CrossFit Projects**") and Reebok shall not intentionally interfere with or obstruct such CrossFit Projects.

3.1.5 Reebok shall, during the Term, provide such funding (estimated to be no more than $10,000/year on average during the Term) to each CrossFit Reebok Gym as the affiliate-operator and Reebok mutually agree to, among other things, possibly pay affiliation fees, purchase and maintain equipment, organize, activate and host promotions or events, facilitate and provide tools and equipment for health-related testing, etc.

3.1.6 Unless CrossFit terminates this Agreement for Reebok's uncured material breach, CrossFit agrees that, subject to compliance with CrossFit's then-current affiliation license, rules and regulations and subject to the terms and conditions of this Agreement, it will not revoke the affiliate license of the CrossFit Reebok Gyms solely as a result of the expiration of this Agreement; *provided however*, that this relates only to the operation and maintenance of CrossFit Reebok Gyms open and in good standing with CrossFit as of the date of expiration and does not include the right to open new CrossFit Reebok Gyms after such date.

**3.2** Reebok Competitor CrossFit Gyms. CrossFit hereby agrees, during the Term, subject to the terms and conditions of this Agreement, that it shall not grant CrossFit affiliation to a prospective candidate if such candidate submits as its official CrossFit affiliate name the name of a Reebok Competitor (i.e., CrossFit Nike gym) listed in Schedule D attached hereto.

**3.3** CrossFit Affiliation License, Rules and Regulations. Reebok acknowledges and agrees that CrossFit shall, at all times, be free, subject to the terms of this Agreement, to unilaterally establish, modify, update, suspend, remove or change, in whole or in part, its own affiliation fee schedule, prices and terms and conditions with respect to the affiliation program, and advertise, market, promote, operate, use and exploit the affiliation program in its sole and absolute discretion. Reebok and its employees or agents shall have no authority to instruct CrossFit as to what its fee schedule, prices, terms, rules or regulations must be, nor to interfere with CrossFit's independent establishment, modification, updating, suspension, removal or change of any such fee schedule, prices, rules, regulations, terms or conditions. Notwithstanding the foregoing, for so long as there are CrossFit Reebok Gyms, CrossFit shall at no time, either during or after the Term, alter its affiliation fee schedule, prices, terms, rules, regulations or affiliation license in contravention of the terms of this Agreement or in any manner intended to adversely impact, either directly or indirectly, only the CrossFit Reebok Gyms.

## 4. SPONSORSHIP OF CROSSFIT GAMES

**4.1** Appointment as Title Sponsor. Subject to the terms and conditions of this Agreement, CrossFit hereby agrees that, beginning with the 2012 CrossFit Games and continuing until, and including, the 2020 CrossFit Games, Reebok shall be designated as the official title sponsor of the CrossFit Games, including all qualifying rounds of the CrossFit Games.

6

**4.2**  Identification as Title Sponsor.  The CrossFit Games shall be branded as "The CrossFit Reebok Games" in a form to be mutually agreed upon by the parties and generally based on the form as shown on **Appendix A**, as may be and providing for year to year modifications to such logo to reflect the look and feel of the CrossFit Games, as determined by CrossFit, and such mutually-agreed upon logo (the "**Games Logo**") will be used in relevant promotional communications related to the CrossFit Games, including, but not limited to, advertisements, print, radio and television materials, brochures, flyers, press releases, programs and other promotional materials of any kind or description in any way produced by CrossFit in association with the CrossFit Games.  The Games Logo will be deemed to be two separate trademarks used together: (i) the applicable Reebok Trademark(s) will be deemed a Reebok Trademark under this Agreement, and (ii) all other elements (including CrossFit Trademarks and any graphic elements) will be deemed a CrossFit Trademark under this Agreement.  In addition to the rights granted to CrossFit in Section 11.1, after the Term, CrossFit will continue to own and will be free to use any portions of the Games Logo other than the Reebok Trademark(s) contained therein;

**4.3**  Specific Sponsorship Rights.  Subject to the terms and conditions of this Agreement, including timely payment by Reebok of all amounts owed to CrossFit under this Section 4, in connection with the CrossFit Games, CrossFit will provide Reebok with the following sponsorship rights and benefits:

    4.3.1  Subject to Section 4.3.2 below, Reebok shall be the exclusive provider of CrossFit Games-branded products included in United States Patent and Trademark Office ("**USPTO**") International Class 25 ("**USPTO Class 25**"), including without limitation, footwear (provided that participants shall not be required to wear such footwear and may wear any footwear, whether Reebok's or not, in their sole discretion), apparel, apparel-related accessories (e.g., bandana), socks (provided that participants may at all times wear non-branded socks that do not include the identifiable designs of a Reebok Competitor) and headwear (the "**Games Apparel**") for all Global CrossFit Games participants  and no other CrossFit Games sponsor logos may appear on Games Apparel without Reebok's prior written consent, which may be withheld in its reasonable discretion. Reebok shall design, create, manufacture and deliver all such Games Apparel at its sole cost and expense and all such Games Apparel shall be subject to CrossFit's prior written approval, which shall not be unreasonably withheld in accordance with Section 10. Reebok acknowledges and agrees that, subject to Section 4.3.6 below, branding on all such Games Apparel shall primarily consist of CrossFit and CrossFit Games branding and not branding of any third party, including Reebok (provided that inclusion of the Reebok Trademark in the CrossFit Games logo shall not be counted as Reebok branding for purposes of this provision). Reebok shall make available to participants, at each Regional CrossFit Game, qualifying for the Global CrossFit Games, and at the Global CrossFit Games, a reasonable selection of Games Apparel in a range of sizes, styles and colors, all at no cost to such participants, for use at the Global CrossFit Games.  Reebok shall also make available to participants, at no cost, at the Global CrossFit Games, a tailor to alter such Games Apparel as reasonably requested by such participants;

    4.3.2  Notwithstanding the exclusivity granted to Reebok under Section 4.3.1, participating athletes at all levels of competition shall be permitted to wear base layer apparel including short sleeve, long sleeve, tights, shorts, bibs, sport socks,

sport sleeves, and upper body and lower body products produced by SKINS (the "**SKINS Product**") until the end of 2014. Thereafter, such athletes may continue wearing SKINS' Product only if the branding has been removed or blacked out. In addition, during the Term, CrossFit Games athletes may continue wearing any base layer apparel or product so long as the branding has been removed or blacked out. Other than in accordance with this Section 4.3.2, at no time while participating in the Global CrossFit Games (i.e., competing in Global CrossFit Games events or participating in opening, closing, or award ceremonies for the Global CrossFit Games) shall the participating CrossFit athletes be permitted to wear apparel with visible logos or identifiable designs of Reebok Competitors. Notwithstanding the foregoing, situations such as where a Global CrossFit Games participant removes his shirt and the waistband, including the brand name of Reebok Competitor, of clothing underneath his official Global CrossFit Games shorts becomes visible shall be permitted and will not be considered to violate the exclusive rights granted to Reebok herein; provided, however, that, CrossFit shall take reasonable steps to prevent the display, including, but not limited to, reminding the offending athlete of the need to cover the branding or, when Reebok or CrossFit have a reasonable basis for believing that such athlete is making an intentional effort to display the brand name of a Reebok Competitor, to remove or black out the branding.

4.3.3    Reebok shall be the exclusive provider, at its sole cost and expense, to all CrossFit athletes at the Regional and Global CrossFit Games of CrossFit Games-branded bags, sport bags and athletic bags (the "**Athlete Bags**") and no other sponsor logos may appear on Athlete Bags without Reebok's prior written consent, which may be withheld in its reasonable discretion;

4.3.4    Reebok shall be the exclusive provider, at its sole cost and expense, of all CrossFit Games-branded "gear" (shirts, shorts, footwear, socks, headwear) and Athlete Bags    for CrossFit Games officials, volunteers and other relevant CrossFit staff (the "**Official Gear**") and such officials, volunteers and other relevant CrossFit staff shall not be permitted to wear footwear, apparel or accessories with visible logos of Reebok Competitors; provided, however, that a volunteer's refusal to wear Reebok socks or footwear, when considered individually shall not constitute a material breach but may, in Reebok's reasonable discretion, constitute a material breach when considered in the aggregate.

4.3.5    Reebok shall be the exclusive provider with respect to CrossFit Games-branded "fan gear" included in USPTO Class 25, CrossFit Games-branded bags, sport bags and athletic bags and such other CrossFit-branded products as Reebok and CrossFit may from time to time agree (the "**Fan Gear**");

4.3.6    For the avoidance of doubt, subject to CrossFit's approval under Section 10.1., Reebok shall be free to place the Reebok Trademarks on all Games Apparel, Athlete Bags, Official Gear and Fan Gear; provided, however, that at no time shall Reebok be required, without its reasonable consent, to reduce its logo to less then six square inches or use a color other than a contrasting color for its logo;

4.3.7    the option to host Sectional (as relevant) and/or a Regional Games at Reebok campus in Canton, Massachusetts;

8

4.3.8    athlete registration form shall grant CrossFit the sublicenseable right to use participating athlete's images and/or names in CrossFit or CrossFit Games-related marketing/advertisements;

4.3.9    purses for winning athletes at the Global CrossFit Games Championship level shall, and at the Sectional and Regional levels may, consist of both a cash prize and a Reebok endorsement contract as mutually determined by the parties;

4.3.10  CrossFit and Reebok may mutually determine  to award winning athletes at the Sectional and Regional level with payment of travel expenses to the next level of CrossFit Games in addition to the purse;

4.3.11  Reebok shall provide to CrossFit the cash purse and shall make available to participants the value of the endorsements for each year of the CrossFit Games in accordance with the table described at Section 4.10 herein (provided, however, that only the size of the purse and the availability, but not the amount, of endorsement funds may be advertised or otherwise disclosed to the CrossFit Games participants and Reebok shall be free to expend endorsement money not accepted by winning athletes on such other CrossFit athletes as it may select), and CrossFit and Reebok shall mutually determine the allocations of prize money between the Regional and Championship levels of the CrossFit Games;

4.3.12  Subject to CrossFit's reasonable approval, the right to create and present one or more "special", Reebok-branded awards for participating athletes;

4.3.13  prominent logo placement (as mutually agreed) on the official CrossFit Games web site hosted by CrossFit and links from any such CrossFit Games web site to Reebok requested web sites, subject to CrossFit's reasonable approval;

4.3.14  center-piece third-party brand for stadium competition surface, size, style and placement of logo to be mutually-agreed upon;

4.3.15  subject to CrossFit's reasonable approval as to overall appearance, pre-eminent third party brand for winners circle (as applicable), with any other third-party logos or trademarks no more than one-third (1/3) the size of the CrossFit-approved Reebok Trademarks as they appear on any winners circle surface or location;

4.3.16  prominent third-party logo placement on marquee locations at each CrossFit Games venue operated by CrossFit, such marquee locations to be mutually agreed to by the parties after review of such venue; and provided further, that once the parties have agreed to the placement of Reebok's logos under Sections 4.3.16 and 4.3.17, Reebok shall not have the right to require CrossFit to remove any logo from any other location in the venue, whether a logo of a sponsor, advertiser or supplier or other licensor or licensee of CrossFit (so long as such use and display complies with the terms of this Agreement), CrossFit logo or banner.  Furthermore, Reebok shall not have the right to require CrossFit to cover, obscure or remove any logo from any location in the venue to which such logo is affixed by the owners/operators of the venue and not by CrossFit, provided, however, that CrossFit shall permit Reebok to take reasonable steps, as permitted under CrossFit's use agreement for the venue, to cover such logos.

4.3.17   subject to CrossFit's reasonable approval as to overall appearance, exclusive third-party logo placement on fifty percent (50%) of all remaining logo placement and signage opportunities at each CrossFit Games venue (taking into consideration mandatory signage at venue location);

4.3.18   the right, at Reebok's sole cost and expense (including Reebok's sole responsibility to comply with all applicable laws and the timely fulfillment of such offer) to place a Reebok coupon on the back of CrossFit Games tickets if practical to do so;

4.3.19   regular public address announcements acknowledging Reebok as official title sponsor throughout any CrossFit Games;

4.3.20   cover 2 spread (inside front cover) and cover 4 (back cover) in any official program produced by CrossFit for use at any CrossFit Games (creative, layout design, concept, artwork, etc., to be timely provided and delivered by Reebok no later than the CrossFit-determined closing deadline for receipt of such materials, at its sole cost and expense, and subject to CrossFit's reasonable approval);

4.3.21   CrossFit shall provide Reebok with advance review, but not approval, of CrossFit's marketing plans for upcoming CrossFit Games, such marketing plans to include a list of the additional sponsors CrossFit intends to target and details regarding newly created advertising packages or other marketing elements for upcoming CrossFit Games.  As reasonably requested by CrossFit, Reebok shall, where possible, facilitate introductions to any such additional sponsors;

4.3.22   with the intent of further deepening the CrossFit and Reebok collaboration with respect to the CrossFit Games, Reebok's review of the marketing plans shall include good faith discussions between CrossFit and Reebok as to whether or not it would be appropriate for Reebok to take advantage of the newly created advertising packages or other marketing elements described in the CrossFit Games marketing plans or if it would be more appropriate to first offer such opportunities to other or new sponsors;

4.3.23   If requested by CrossFit, and unless the Global CrossFit Games are televised live on broadcast television (including cable, satellite, and similar technology, e.g., ESPN) and such broadcast deal includes the right for such broadcast partner to host the official live stream for such Global CrossFit Games on its website and Reebok will not be the prominent sponsor (e.g., "brought to you by") for such live stream, Reebok shall pay CrossFit, from its annual marketing commitment, $100,000 per year, payable on or before January 31 in the year of the applicable CrossFit Games in question, to fund the implementation and streaming of the CrossFit Games webcast viewer and Reebok shall receive prominent, non-exclusive branding and sponsorship of such viewer (i.e., "brought to you by");

4.3.24   the exclusive right, at its sole cost and expense and subject to the payment of applicable royalties to CrossFit, to manage on-site concessions for each CrossFit Games venue solely with respect to Fan Gear and such other CrossFit Games branded items as Reebok and CrossFit may reasonably agree (for the sake of clarity, it is understood that nothing in this Agreement shall prevent or prohibit CrossFit from allowing any third-party vendor to participate or sell products or services in a separate and secondary on-site vendor fair or exhibition);

4.3.25 subject to CrossFit's reasonable approval, the right to an on-site consumer tent or Reebok, interactive experience;

4.3.26 tickets to CrossFit Games for Reebok and its guests and access to a VIP lounge (or the right to create, at its sole cost and expense, a VIP lounge of its own on the CrossFit Games premises);

4.3.27 to the extent permissible under any broadcast agreement that may be reached pursuant to this Agreement, the right to frame CrossFit's official web cast of the CrossFit Games from a mutually-agreed upon Reebok web-site;

4.3.28 in accordance with such communication guidelines as CrossFit may provide to Reebok from time to time, the right to create public relations programs and to communicate those programs and the relationship between Reebok and CrossFit to outside audiences within the Territory;

4.3.29 in accordance with such applicable guidelines as CrossFit may provide to Reebok, the right to develop and conduct joint marketing, advertising, and promotions with Reebok's customers incorporating or displaying the CrossFit Trademarks with Reebok's and/or its customers' trademarks, logos and/or branded products (all in association with Reebok's products) in connection with promotion of the CrossFit Games; and

4.3.30 in accordance with such applicable guidelines as CrossFit may provide to Reebok, the right to create and to use, at Reebok's sole cost and expense, video, audio and still images of the CrossFit Games ("**Reebok Footage**") and to use such Reebok Footage for advertising and promotion of the CrossFit Games, Licensed Products and/or CrossFit athletes (provided that all CrossFit athletes will be identified as participants in the CrossFit Games or as otherwise affiliated with CrossFit). For clarity, Reebok may use, distribute, copy, and display such Reebok Footage in its discretion; provided such use does not misrepresent Reebok's relationship with CrossFit, does not modify the Reebok Footage in a misleading manner, and is not associated with any Damaging Statements. Notwithstanding anything in this Agreement to the contrary, after the Term, Reebok will have the right to use the Reebok Footage (including any CrossFit Trademarks contained therein) only (i) for internal purposes, (ii) to fairly and accurately depict historical footage of any Reebok-sponsored athletes, or (iii) to fairly and accurately reference Reebok's prior sponsorship of the CrossFit Games. In no event will Reebok use the Reebok Footage after the Term to imply a false on-going sponsorship or affiliation with CrossFit.

Reebok shall ensure that any and all marketing, promotion and advertising related to CrossFit or created, used, distributed, displayed or published in connection with this Agreement, including, without limitation, any consumer offers, complies with all applicable laws, rules, guidelines, and regulations, including truth in advertising, and Reebok shall be, at its sole cost and expense, responsible for redemption, fulfillment, execution, and administration of any consumer offers.

**4.4** Game Management. As between Reebok and CrossFit, CrossFit (or its designee) shall be responsible for, directly or indirectly through a sublicensee or subcontractor, the creation, coordination, programming, operation, production, judging and management of the CrossFit Games, including, without limitation, i) obtaining any licenses, permits or other authority required to conduct the CrossFit

Games, ii) providing for all CrossFit Games facilities, equipment and fixtures, iii) arranging for adequate security, iv) arranging for adequate sanitary facilities, v) arranging for any food or beverage service, vi) arranging for clean-up, vii) conducting the CrossFit Games in compliance with all applicable laws, regulations and local ordinances, and vii) operating any vendor fair or exhibition at the CrossFit Games venue. With respect to the vendor fair or exhibition referenced by subsection (vii) above (the "**Vendor Fair**"), CrossFit shall take reasonable steps to ensure that the Vendor Fair does not overly dilute the sponsorship rights granted to Reebok hereunder. Such reasonable steps shall include, but shall not be limited to, reasonable restrictions on signage size and heights.

**4.5** CrossFit's Right in the CrossFit Games. Other than as expressly provided for herein relating to Reebok's sponsorship rights in connection with the CrossFit Games and the use of Reebok Trademarks, CrossFit shall have complete and exclusive control--at its sole and absolute discretion--over all aspects of the CrossFit Games, including, without limitation, the Global CrossFit Games, Regional CrossFit Games, Sectional CrossFit Games, in whole or in part, and any and all CrossFit-related fitness or sporting events or contests, including, without limitation, any and all marketing, advertising, promotion, operation, format, structure, location, naming, seeding, trademarks, taglines, judging, standards, qualifications, registration, pricing, exploitation and use of the CrossFit Games and any derivatives thereof and thereto.

**4.6** Broadcast Coverage. Reebok shall use efforts (e.g., to leverage existing network relationships in order to make introductions) to support CrossFit's efforts to obtain a TV license for the CrossFit Games which shall, at the very least, continue to identify Reebok as the title sponsor of the CrossFit Games during the Term. In addition, CrossFit shall ensure that Reebok has the first opportunity with respect to all advertising rights made available to sponsors in connection with the broadcast.

**4.7** Key Market Games. CrossFit shall cooperate with Reebok's efforts to host, at Reebok's sole cost and expense, Sectional-level CrossFit Games in the key markets set forth on Schedule E (the "**Key Market Games**") and shall, subject to such events' compliance with CrossFit's standards for the CrossFit Games, work with Reebok to ensure that such Sectional-level games are structured in such a manner as to permit athletes participating in the Key Market Games to be included in the progression from Sectional to Regional CrossFit Games. Reebok shall comply in all material respects with CrossFit's requirements for, and guidance on, the operation, format, structure, seeding, judging, standards and qualifications for the Key Market Games. The cost of the Key Market Games may be counted against Reebok's Marketing commitments in Section 8.6.

**4.8** Exclusivity. During the Term, CrossFit shall not enter into a licensing, promotional, marketing, sponsor or supplier relationship with respect to the CrossFit Games with any Reebok Competitor.

**4.9** Failure to Hold CrossFit Games. CrossFit shall use its best efforts to hold Regional and Global CrossFit Games during every year of the Term and its failure to do so shall relieve Reebok of its title sponsorship fee payment obligations solely with respect to the year in which the CrossFit Games are not held. Notwithstanding the foregoing, should CrossFit fail to hold the Regional or Global CrossFit Games as the result of either a Force Majeure Event or as a result of Reebok's breach of this Agreement, then Reebok shall reimburse CrossFit for actual expenses incurred but

not recoupable with respect to such Regional or Global CrossFit Games up to but not exceeding the amount that would otherwise be due under this Section 4.

**4.10**   Sponsor Obligations. Reebok shall provide CrossFit with the following amounts in purse money, cash sponsorship and Reebok endorsement money (amounts in millions), in addition to the Reebok marketing commitment and activation amounts described in Section 8.7:

|  | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|
| Purse | $1.0 | $1.0 | $1.0 | $1.0 | $1.0 | $1.0 | $1.0 | $1.0 | $1.0 |
| Cash Sponsorship Fee | $0.8 | $1.0 | $1.2 | $1.5 | $1.7 | $2.0 | $2.35 | $2.6 | $3.0 |
| Endorsements | $.300 | $.300 | $.300 | $.300 | $.300 | $.3 | $.400 | $.400 | $.500 |

Reebok shall pay CrossFit the non-refundable, non-recoupable Cash Sponsorship Fee described in the table above on or before October 15 of the year prior to the year of such CrossFit Games (for example, for the 2012 CrossFit Games, Reebok shall pay CrossFit $800,000 on or before October 15, 2011).

## 5.   APPLICATION; SUPPORT FOR CERTIFIED TRAINERS

**5.1**   Data Tool Sponsor. During the Term, Reebok shall pay CrossFit $100,000 per year, commencing on the Effective Date and thereafter on the anniversary date of the Effective Date each year thereafter, for prominent, top-tier sponsorship and branding ("presented by") of a CrossFit best practices data gathering and data mining tool (the "**Application**"), as such Application shall be developed, designed, hosted, operated, used, exploited, commercialized, published and distributed in CrossFit's sole and absolute discretion.  For the avoidance of doubt, CrossFit and CrossFit's third party developer shall own all right, title and interest in and to such Application and any and all modifications, updates and derivatives thereof and all Intellectual Property Rights in and to the foregoing. CrossFit may, but is not obligated to, share aggregated, non-personally identifiable, relevant data with Reebok in connection with mutually-agreed upon charitable endeavors undertaken by the parties. CrossFit shall investigate the possibility of creating a version of the Application that may be used by CrossFit and Reebok, jointly, in connection with their joint charitable endeavors concerning fitness and kids and, if reasonably practicable (taking into consideration deliverable schedules, development fees, resources and staffing), may create such new version of the Application (which shall be, excluding any Reebok Trademarks or Reebok Products that may be displayed or incorporated therein, solely owned by CrossFit, including, without limitation, any and all Intellectual Property Rights related thereto).  Subject to compliance with applicable laws, rules and regulations and the relevant privacy policy(ies), Reebok shall have unfettered access to any non-personally identifiable data gathered as a result of use of the new version of the Application. The specific branding and advertising elements included with such Application will be mutually-agreed upon and the exact placement, size, duration, style and messaging shall be determined by CrossFit in its sole and absolute discretion.

5.2     CrossFit Trainers. CrossFit shall facilitate communication between Reebok and CrossFit trainers and instructors (the "**CrossFit Trainers**") for the sole purpose of developing a close service relationship between Reebok and the CrossFit Trainers as contemplated by this Agreement.

5.3     Trainer Outfitter. CrossFit shall use its reasonable efforts to encourage CrossFit Trainers to use the Licensed Products made available to such CrossFit Trainers through the Trainer Program.

5.4.    Trainer Support. Reebok shall develop, host and operate, at its sole cost and expense, a "**Trainer Program**" that will include (amongst other things) access to Licensed Products and select Reebok Products during the Term, significant discounts on such Licensed Products and other products, a mutually-agreed upon commission/referral program that provides CrossFit Gyms with a commission on sales from referred customers (the "**Reebok Trainer Site**"). With respect to the Trainer Program, Reebok shall provide CrossFit with annual reports indicating the amount and type of Licensed Products and other products purchased from the Reebok Trainer Site, CrossFit shall maintain a "click-through" link on its relevant websites, as described in Schedule 7.1, to such Reebok Trainer Site and other mutually-agreed upon Reebok websites as Reebok may from time to time reasonably request.

5.5     Licensed Product Development. Reebok, at its sole cost and expense, shall use its best efforts to obtain input from select CrossFit Trainers, CrossFit Games athletes and CrossFit HQ staff in the development of Licensed Products, including, without limitation, including such individuals in research and development and design at Reebok's facilities, online and through other means and methods, it being understood that any participating CrossFit Trainer, CrossFit Games athlete or CrossFit HQ staff member shall execute such documents concerning ownership of (including intellectual property rights in and to) such Licensed Products as Reebok may reasonably require before participating. Reebok shall provide CrossFit with copies of such documents in advance of any request for execution.

## 6.    **LICENSED AND OTHER PRODUCT SUPPLY FOR CROSSFIT STAFF/TRAINERS**

6.1     CrossFit Corporate Staff and Certification Trainers. Reebok shall timely supply, deliver and make available, at its sole cost and expense, a reasonable range of mutually-agreed upon Licensed Products and other mutually-agreed upon Reebok Products for CrossFit corporate staff and all CrossFit certification staff (excluding CrossFit Specialty Certification seminars and staff), as selected by such staff and trainers, to use and wear exclusively during all CrossFit certification seminars and other mutually-agreed upon activities during which it would be appropriate to wear such Licensed Products. Reebok shall, at its sole cost and expense, make additional Licensed Products and such other Reebok Products as Reebok and CrossFit may mutually determine, available at a discounted price to all CrossFit corporate staff and certification trainers (CrossFit and Reebok shall determine whether such products shall be made available from a website for such staff and trainers to order from and/or have such products delivered to locations requested by CrossFit).

## 7.    **CROSSFIT GYM SALES; INTERNET SALES**

7.1     Internet Sales. In accordance with a mutually-agreed upon schedule, Reebok shall assume sole responsibility, at its sole cost and expense, for the operation, hosting,

maintenance, quality assurance, technical operation, compliance with applicable laws, rules and regulations, hardware, software, customer service, technical support, order processing and fulfillment, calculation, withholding and remittance of all appropriate taxes, shipping, warehousing, freight, uptime, etc., of CrossFit's on-line store at http://store.crossfit.com/ (or any successor URLs as determined by CrossFit) (the "**On-Line Store**"). The On-Line Store will maintain the overall look and feel of the current CrossFit online store and the parties intend to structure the On-Line Store in accordance with store structure set forth on **Exhibit 7.1**, unless approved in writing in advance by CrossFit. Reebok shall ensure that the On-Line Store is operational and available for order processing from consumers on a 99.95% monthly basis (except for mutually-agreed upon scheduled downtime for maintenance or as the result of a "force majeure"). CrossFit shall receive a royalty equal to the Lifestyle Category royalty described herein for all CrossFit-related items sold by or on behalf of Reebok through the On-Line Store while Reebok is responsible for the On-Line Store, including, without limitation, any Open-Category products sold online by Reebok or through the On-Line Store. For the avoidance of doubt, in the event the CrossFit Journal, CrossFit affiliate fees or dues, seminar or certification fees or the like are available for subscription or purchase directly or indirectly through the On-Line Store, Reebok acknowledges and agrees that it has no expectancy with respect to and shall not receive or share any fees, consideration, commission, payments, royalties or revenue in connection with any such purchases, subscriptions, transactions or proposed transactions and CrossFit acknowledges and agrees that Reebok shall have no fulfillment or other obligations with respect to such subscriptions or purchases. In addition, for all Reebok Products sold as a result of a consumer's click-through from the On-Line Store to a Reebok website (the "**Referral Products**"), CrossFit shall receive a payment equal to 5% of the Net Sales of such Referral Products.    Reebok shall be responsible for providing all information necessary to allow CrossFit Gyms to make appropriate links from the On-Line Store to each such CrossFit Gym site to facilitate the referral/commission program described herein. Reebok shall be solely responsible for processing every order placed by a customer following a special link from a CrossFit Gym site, for tracking the volume and amount of sales generated by such site, and for providing information to CrossFit Gym sites regarding sales statistics. Other than with respect to the existing CrossFit-related inventory set forth on **Schedule F (to be provided as soon as practicable after the Effective Date)** or, unless Reebok specifically agrees otherwise, products other than Licensed Products which are offered at the On-Line Store at CrossFit's request, Reebok shall be solely responsible for order entry, payment processing, calculating, withholding and remitting applicable taxes, shipping, cancellations, returns, and related customer service and Reebok shall indemnify defend and hold CrossFit harmless from the foregoing. In the event of the expiration or early termination of this Agreement, the parties will work in good faith to facilitate a smooth transition of the operation of the On-Line Store from Reebok to CrossFit or CrossFit's designee. Notwithstanding anything herein to the contrary, CrossFit shall not be required to cease the sale, distribution or promotion of, or destroy, any of the existing CrossFit-related inventory set forth on Schedule F and may continue to sell, distribute or promote such items through the On-Line Store and otherwise.

7.2     User Data Collection, Use, and Ownership. Customers and potential customers who visit or use the On-line Store may provide (knowingly or not) certain information, which may be associated with other data maintained by or on behalf of Reebok, Reebok's licensors, licensees or agents, or other information obtained or generated by or on behalf of Reebok or Reebok's licensors, licensees or agents, that may

contain personally identifiable information, merchant data or information or other information or data whether purchase-related or not (such as buying patterns) (collectively, the "**User Data**"). User Data collected by on behalf of Reebok or Reebok's licensors, licensees or agents in connection with a transaction related to the Online Store (completed or not), including data collected, analyzed or mined, shall be owned exclusively by CrossFit and CrossFit may use all such User Data as it shall determine in its sole discretion. Reebok and its licensors, licensees and agents shall use this data solely to fulfill Reebok's obligations hereunder and such data and information shall be considered CrossFit Confidential Information. Unless a customer or potential customer has granted Reebok the right to do otherwise by opting-in to receive marketing messages from Reebok in accordance with Reebok's published privacy policy, Reebok shall not, directly or indirectly, and shall not permit any third party to, disclose, use, publish, exploit, rent, loan, lease, license, barter, exploit, monetize, market to or distribute any User Data or statistical data, whether in an aggregated form or not, from or related to CrossFit's customers or related to the Online Store.

7.3   Product Promotion Materials. Reebok, in its discretion, may license and deliver to CrossFit promotional materials for the Licensed Products, including, without limitation, a CD-ROM or DVD containing all of Reebok's approved branding, logos, graphics, product photos, action photography and text copy descriptions of the Licensed Products (the "**Product Promotion Materials**"), for CrossFit to use in connection with its advertisement or promotion of the Licensed Products. All such Product Promotion Materials shall be pre-approved by Reebok and CrossFit may use, distribute, copy and display such materials in its discretion; provided such use does not misrepresent CrossFit's relationship with Reebok, is without modification of the Product Promotion Materials as provided to CrossFit (except as approved in advance by Reebok, which approval shall not be unreasonably withheld), and is not associated with any Damaging Statements. Any use, reproduction, publication, or presentation of Reebok Property (including, without limitation, the Reebok Trademarks, but excluding any CrossFit Property) not provided within the Product Promotion Materials or expressly authorized hereunder shall require Reebok's prior written approval.

## 8.   MARKETING RIGHTS

8.1   General Advertisement. Subject to the terms and conditions of this Agreement, CrossFit hereby agrees to use its commercially reasonable efforts to provide Reebok, during the Term, the following general advertising rights:

   8.1.1   Reebok will be designated as "The Authentic Outfitter of CrossFit" or, beginning in 2012, "The Authentic Outfitter of the CrossFit Games" or any mutually-agreed upon combination thereof. This designation will be highlighted, as mutually agreed, at relevant CrossFit Games events or in mention of Reebok in CrossFit Games related press releases, print or electronic advertising, CrossFit Games websites, CrossFit Games publications and elsewhere as deemed appropriate by CrossFit, and Reebok shall have, subject to CrossFit's promulgated guidelines, the right to use the designation in any and all of its own CrossFit Games-related marketing and advertising materials (electronic or otherwise), press releases and on its websites; and

   8.1.2   CrossFit will use reasonable efforts to encourage that the Reebok name and/or logo be reasonably displayed at relevant CrossFit events, as determined by

CrossFit, and no Reebok Competitor shall be advertised on any CrossFit-hosted and maintained website.

8.2 Reasonable Efforts. Throughout the Term, CrossFit shall use its reasonable efforts to promote the Licensed Products to and among CrossFit participants. Reebok shall use its reasonable efforts to promote CrossFit and the CrossFit Program in relevant and appropriate promotional and advertising activities Reebok participates in. During the Term, and subject to the terms and conditions hereof, Reebok shall use its reasonable efforts to make and maintain adequate arrangements for the distribution, shipment and sale necessary to meet the demand for such Licensed Products.

8.3 Damaging Statements. Reebok shall use reasonable efforts to ensure that neither it, nor any of its officers or directors shall make damaging or unfavorable public statements regarding CrossFit or Reebok's association with CrossFit or its personnel. CrossFit shall use reasonable efforts to ensure that neither it, nor any of its officers or directors, shall make damaging or unfavorable public statements regarding Reebok or CrossFit's association with Reebok, the Licensed Products, Reebok Products, Reebok programs, or personnel (any such statements referred to in this Section 8.3 shall be a "**Damaging Statement**").

8.4 Exclusivity. During the Term, CrossFit shall not enter into any form of licensing, promotional, marketing, sponsor or supplier relationship with any Reebok Competitor.

8.5 Reebok Marketing Commitment. During the Term, Reebok shall spend at least the amounts set forth below for both marketing and activation related to (either in combination with Reebok Products, in combination with another asset/item in the following list or alone) the CrossFit Games, the Licensed Products, the CrossFit Reebok Gyms, the CrossFit Trainers, CrossFit Gyms, Trainer Program, CrossFit athletes (provided that all CrossFit athletes will be identified as participants in the CrossFit Games or as otherwise affiliated with CrossFit) and other mutually-agreed upon programs as follows (amounts in millions):

| | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|
| Marketing | $6.6M | $7.7M | $8.8M | $9.9M | $11M | $12.1M | $13.2M | $14.3M | $15.4M |

8.6 Reebok's annual marketing commitment described in Section 8.5 above will at no time consist of less than eighty percent (80%) of such commitment (calculated on an annual basis) spent with unaffiliated third parties for traditional media purchases and related creative (i.e., print, online, television, radio, point of purchase/retail, etc.) and no more than twenty percent (20%) spent on production for marketing and activation programs. Reebok will provide CrossFit, for its review and comment, a proposed marketing, cooperative advertising and public relations plan reflecting the Marketing Commitment set forth above (the "**Marketing Plan**"). Although Reebok shall be open to comments from CrossFit and may alter the Marketing Plan as a result of such comments, it shall be under no obligation to do so.

8.7 Corporate Responsibility/Reebok Public Charity. In recognition of their belief that fitness can change the world, Reebok and CrossFit shall use commercially

reasonable efforts to collaborate on an initiative intended to increase children's physical and cognitive fitness through before school exercise programs which may be based, in part, on the CrossFit Program. CrossFit shall use commercially reasonable efforts to encourage CrossFit Trainers and the broader CrossFit community to support the initiative and both CrossFit and Reebok shall endeavour to raise donations through individual or joint fundraising efforts. CrossFit will use its best efforts to ensure that at least one CrossFit community fundraising event is held in each year of the Term, the beneficiary of which will be the I.R.C. section 501(c)(3) charitable organization Reebok has organized to support this endeavour (the "**Reebok Charity**").    In addition, during the Term, CrossFit will further support the Reebok Charity by providing a charitable donation of $25 for each completed and paid CrossFit Kids certification (or a reasonable substitute therefore, should CrossFit cease granting CrossFit Kids certifications).

## 9.    ROYALTIES ON LICENSED PRODUCTS

**9.1**    Royalties.  Reebok shall pay to CrossFit a quarterly royalty, equal to the rates set forth below (the "**Royalty Rate**") on the Net Sales for all Licensed Products.

| Contract Years | Performance Category | Lifestyle and Open Category | CrossFit Games Apparel |
|---|---|---|---|
| 1-10 | 5% | 10%* | 10% |

*with respect to Open Category Products, this Royalty Rate shall apply only to Open Category Products sold by Reebok on-line or through the On-Line Store.

All royalties due CrossFit as set forth in Section 9 shall be collectively referred to as "**Royalties**".  Royalties hereunder shall accrue when the Licensed Products are sold.

For the purpose of this provision, "**Net Sales**" shall mean the invoiced selling price of the Licensed Products solely less (i) actual and documented customer returns and taxes, and (ii) chargebacks solely related to the Licensed Products taken in the normal course of business and which are separately stated on an invoice or credit memo. There shall be no other deductions allowed, including deductions for manufacturing costs, selling costs, distribution costs, advertising and promotional costs, freight (unless listed on the invoice), non-collected or uncollectible accounts, commissions, cash discounts, sales to employees or any other costs.

**9.2**    Guarantee. Reebok shall pay CrossFit a non-refundable Royalty guarantee in the amounts and at the times specified below (the "**Guarantee**").  Reebok shall be entitled to apply the Guarantee against Royalties due CrossFit hereunder during the Term.

For contract years 1-3, Two Hundred and Fifty Thousand United States Dollars (U.S. $250,000.00) per year payable on the Effective Date (for year one) and payable each year on the anniversary date of the Effective Date thereafter (years 2 and 3); and

For contract years 4-6, Five Hundred Thousand United States Dollars (U.S. $500,000.00) per year payable each year upon the anniversary date of the Effective Date; and

For contract years 7-10, Seven Hundred and Fifty Thousand United States Dollars (U.S. $750,000.00) per year payable each year upon the anniversary date of the Effective Date.

**9.3**     Reebok shall pay, and hold CrossFit forever harmless from, all taxes, customs, duties, levies, import, export or any other charges now or hereafter imposed or based upon the manufacture, delivery, license, sale, possession or use hereunder to or by Reebok of the Licensed Products (excluding the CrossFit Trademarks) (including, but not limited to sales, use, inventory, income, consumption and value added taxes on sales of Licensed Products), which charges shall not be deducted from the Guarantee.

**9.4**     Timing of Statements and Payments. Reebok Royalty statements and payments due to CrossFit shall be mailed within forty-five (45) days after the end of each calendar quarter commencing with the first quarter. Such reports will include, on a sku by sku basis, and to the extent reasonably available to Reebok, sales volume, territory and channel of distribution for such sales.

**9.5**     Books and Records. For a period of two (2) years following the termination of this Agreement, Reebok shall keep or cause to be kept accurate, separate, complete and up-to-date books of account stating, by code or other clear means, records of all sales of the Licensed Products. No more than once per calendar year, CrossFit or its authorized representatives shall have the right to inspect or audit all such records of Reebok with respect to the Licensed Products and to make copies of said records utilizing Reebok's facilities without charge and shall have free and full access thereto on reasonable notice during normal business hours of Reebok. In the event that such inspection or audit reveals an underpayment by Reebok of any amounts due CrossFit under this Agreement, Reebok shall immediately pay to CrossFit the balance of all such amounts found to be due pursuant to such audit or inspection. All such underpayments by Reebok will be subject to interest charges, at the rate specified for late payments in Section 9.6 below. Further, if such inspection or audit discloses that, for the period reviewed or audited, Reebok has underpaid or understated its obligation under this Agreement by five percent (5%) or more then Reebok shall also pay the cost of such inspection or audit including the reasonable professional fees of the independent representatives engaged to conduct or review such inspection or audit.

**9.6**     Without prejudice to any other rights of CrossFit hereunder, time is of the essence regarding all payments due hereunder and Reebok shall pay interest on any and all delinquent payments hereunder, including, without limitation Royalty and Guarantee payments. Late payments will accrue interest charges at an interest rate of one and one-half percent (1.5%) per month, or the maximum legal rate, if such maximum legal rate is lower, from the date such payments are due to the date of payment, and shall be payable by Reebok on demand.

## 10.     LICENSED PRODUCT APPROVAL/QUALITY CONTROL

**10.1**     Licensed Product Approvals. Reebok shall supply to CrossFit for its approval (i) CAD designs and line plans for the Licensed Products, Athlete Bags, Official Gear and the Fan Gear that Reebok proposes to supply and/or sell and (ii) CAD designs, line plans, fabric samples and prototypes of the Games Apparel it proposes to supply (collectively, the "**Designs**"). CrossFit shall have ten (10) days from receipt of such Designs for Athlete Bags, Official Gear and Fan Gear and fifteen (15) days from receipt of such Designs for Games Apparel to approve or disapprove the Designs (such approval to not be unreasonably withheld). If CrossFit disapproves a Design, CrossFit must provide Reebok with an explanation for why it disapproved the Design. Reebok shall then work with CrossFit to alter such Design until such time

19

as CrossFit approves the Design. If CrossFit has not provided Reebok with notice of disapproval within the proscribed period for response from CrossFit's receipt of a Design, such Design shall be deemed disapproved. At such time, Reebok may send CrossFit written (including emails to the individuals designated by CrossFit to receive emails in such situation) notice requesting approval. If CrossFit does not respond in writing within three (3) business days from such notice with approval or specific reasons why it has been disapproved and suggestions, guidelines or comments necessary to secure approval, the Design shall be deemed approved. Notwithstanding the foregoing, CrossFit shall have the right to approve only the size (subject, in the case of Games Apparel, to the requirements of Section 4.3.6) and placement of the Reebok Trademarks on the Licensed Product and not which Reebok Trademark will be placed on the Licensed Product.

**10.2** Promotional Materials Approvals;. Reebok shall supply to CrossFit for its approval all advertising, promotion, publicity or display materials depicting the CrossFit Trademarks or any item of Licensed Product at the following applicable stages appropriate to the medium used: (i) conceptual stage, pre-production art or rough cuts; and (ii) layout, storyboard or script (collectively, the "**Promotional Materials**"). CrossFit shall have ten (10) days from receipt of such Promotional Materials to approve or disapprove the Promotional Materials (such approval to not be unreasonably withheld). If CrossFit disapproves of any Promotional Material, CrossFit must provide Reebok with an explanation for why it disapproved the Promotional Material. Reebok shall then work with CrossFit to alter such Promotional Material until such time as CrossFit approves the Promotional Material. If CrossFit has not provided Reebok with notice of disapproval within the proscribed period for response from CrossFit's receipt of any Promotional Material, such Promotional Material shall be deemed disapproved. At such time, Reebok may send CrossFit written (including emails to the individuals designated by CrossFit to receive emails in such situation) notice requesting approval. If CrossFit does not respond in writing within three (3) business days from such notice with approval or specific reasons why it has been disapproved and suggestions, guidelines or comments necessary to secure approval, the Promotional Materials shall be deemed approved.

**10.3** Hot Market Product Approval Process. Reebok shall present all blank Licensed Products to be used as Hot Market Products to CrossFit for approval in accordance with Section 10.1 above. If at any time during the Term, Reebok submits to CrossFit graphics to be used on any Hot Market Product, CrossFit shall use commercially reasonable efforts to review such graphics as soon as is reasonably practicable and to notify Reebok in writing no later than forty-eight (48) hours following receipt of such graphics of whether CrossFit is approving or withholding its approval of the graphics. If CrossFit has not provided Reebok with notice of disapproval within the proscribed period for response from CrossFit's receipt of the graphics, such graphics shall be deemed approved. "**Hot Market Products**" means Licensed Products that by their nature may only be produced on a short turn-around time. An example of a Hot Market Product would be apparel bearing a slogan adopted by fans or athletes during a particular Global CrossFit Games.

10.3.1 Quality Standards. Reebok undertakes that the Licensed Products shall be of a standard and quality equal to or greater than the standard and quality of Reebok's own products and manufactured in accordance with the adidas Group Workplace Standards and product safety standards then in place and shall be of such style, design, appearance and workmanship as to enhance the CrossFit Trademarks,

CrossFit Games, the prestige of CrossFit, and the goodwill associated with the CrossFit Trademarks, CrossFit Games and CrossFit. Reebok shall ensure that all Licensed Products and the manufacture, distribution, sale, promotion and advertisement thereof comply with all applicable international, national, federal, state and local laws, treaties and governmental orders and regulations including, without limitation, any applicable regulations of the Federal Trade Commission and the Consumer Safety Commission and/or any analogous organizations. Upon expiration or termination of this Agreement, including during any approved sell-off period, Reebok agrees to refrain from "dumping" the Licensed Product in the market place. "**Dumping**" shall mean the distribution of Licensed Products at volume levels significantly above Reebok's prior sales practices with respect to the Licensed Products, and at price levels so far below prior sales practices with respect to the Licensed Products as to disparage the Licensed Products; *provided, however*, that nothing contained herein shall be deemed to restrict Reebok's ability to set prices at its own unfettered discretion.

**10.4**   Reebok shall furnish to CrossFit, without charge, three (3) samples of each finished Licensed Product from the first production run within a reasonable time after commercial release of each such Licensed Product. CrossFit may, periodically, but not more often than twice per calendar year, during the Term, require that Reebok submit to CrossFit, without charge, up to three (3) additional samples of Licensed Products for subsequent review of the quality of such Licensed Product. No Royalties shall be due or payable on all finished samples furnished to CrossFit. Upon CrossFit's request, Reebok agrees to give CrossFit written notice of the first shipping date in interstate commerce for each Licensed Product. Should CrossFit determine, it its reasonable discretion, that any Licensed Product does not meet the quality standards set forth herein, CrossFit shall provide immediate notice thereof to Reebok, including the basis for CrossFit's determination. Reebok shall thereafter cease manufacture of such Licensed Product or take such measures as are reasonably necessary for such Licensed Product to meet the requisite quality standards.

**10.5**   Third Party Materials. In the event Reebok utilizes photographs, artwork, or any other copyrighted or trademarked materials other than the CrossFit Property ("**Third Party Materials**") on or in connection with Licensed Products, then Reebok shall be solely responsible for obtaining any and all consents, licenses and other permissions which may be required for using such Third Party Materials. Accordingly, Reebok acknowledges and agrees that Reebok use of any Third Party Materials is subject to and conditioned upon Reebok, at Reebok's sole cost and expense, obtaining any and all consents, licenses and other permissions which may be required for using the Third Party Materials, notwithstanding that CrossFit, or its representative, might have approved the Licensed Products embodying or connected with such Third Party Materials.

**10.6**   Promotional Rights. CrossFit shall have the right, subject to compliance with Reebok Usage Guidelines, but not be under any obligation, to engage in any promotional, advertising or display activities with respect to the Licensed Products, or to aid or assist Reebok with any such campaign, including, without limitation, the use of the Licensed Products as props or otherwise in or in association with radio and/or television programs or in association with the cast, characters and/or sponsors of such programs or with the articles of any other licensee of CrossFit. Reebok agrees that CrossFit may include Reebok's name in advertisements with respect to the CrossFit Games, CrossFit Program, CrossFit Reebok Gyms and/or CrossFit

21

Gyms and may distribute a licensee list containing Reebok's name, the Licensed Products and the Territory to members of the media, retailers and others as CrossFit deems necessary. Notwithstanding the foregoing, such use by CrossFit of Reebok's name, Reebok Trademarks, or Licensed Products under this Section 10.6 will not imply a false association or sponsorship by Reebok and will not be associated with Damaging Statements.

## 11. CROSSFIT LICENSE

11.1 Grant of License. Reebok hereby grants CrossFit a non-transferable (except as otherwise expressly provided herein), worldwide, royalty-free limited license, without the right to grant sublicenses (except as expressly authorized pursuant to this Agreement), to use the Reebok Trademarks set forth on **Schedule B** (and any other Reebok Trademarks as may be authorized by Reebok during the Term) solely for the purpose of fulfilling CrossFit's rights and obligations under this Agreement (the "**CrossFit License**"). The CrossFit license shall be perpetual with respect to CrossFit's use of historical or informational CrossFit Footage or other footage or photographs from CrossFit Property, including, without limitation, the CrossFit Games that occur during the Term and include Reebok Trademarks (including, without limitation, the Reebok Trademark(s) used with the Games Logo); *provided that* such use will not imply a false association or sponsorship by Reebok and will not be associated with Damaging Statements.

11.2 Compliance. CrossFit shall comply with Reebok's written guidelines and other written instructions timely provided to CrossFit on proper usage of the Reebok Trademarks (the "**Reebok Usage Guidelines**") and with all applicable laws with respect to printing and placement of proper notice of the Reebok Trademarks on all packaging and advertising, marketing and promotional material created by CrossFit; provided that Reebok shall provide written notice to CrossFit with respect of any change in such Reebok Usage Guidelines and shall provide CrossFit with a reasonable period of time to comply considering the relevant circumstances.

11.3 Global CrossFit Games Footage/Photography. CrossFit represents and warrants that participants in the Global CrossFit Games will sign a waiver under which CrossFit, Reebok, and certain parties have the right to record and photograph the Global CrossFit Games (including, but not limited to the rights to use such photographs and video of the participants participating in the Global CrossFit Games) (all such footage taken by CrossFit or its agents, "**CrossFit Footage**"). During the Term, CrossFit will deliver to Reebok, for no additional consideration, copies of CrossFit Footage sufficient to meet Reebok's marketing and promotional needs, as reasonably requested by Reebok. CrossFit hereby grants to Reebok, during the Term, the non-exclusive, limited, non-transferable right and license to use CrossFit Footage expressly provided by CrossFit to Reebok, to promote Reebok's sponsorship of the Global CrossFit Games. All such CrossFit Footage shall be pre-approved by CrossFit and Reebok may use, distribute, copy, and display such CrossFit Footage in its discretion; provided such use does not misrepresent Reebok's relationship with CrossFit, does not modify the CrossFit Footage in a misleading manner, and is not associated with any Damaging Statements. Any use, reproduction, publication, or presentation of CrossFit Property (including, without limitation, the CrossFit Trademarks but excluding any Reebok Property) not provided within the CrossFit Footage or expressly authorized hereunder shall require CrossFit's prior written approval.

22

## 12. OWNERSHIP

**12.1** Ownership of CrossFit Property. Reebok acknowledges and agrees that all current and future Intellectual Property Rights throughout the universe, through any and all means, in the CrossFit Property shall be the exclusive property of CrossFit, from the moment of creation, whether created by, for, or on behalf of CrossFit or Reebok. For clarity, any derivatives or improvements to the CrossFit Property created as a result of the activities contemplated by this Agreement will be the sole and exclusive property of CrossFit. To the extent that any rights, title, or interests in and to the CrossFit Property or elements thereof are not automatically owned by CrossFit under any applicable law, Reebok agrees to assign and hereby irrevocably assigns and transfers to CrossFit all of its rights, title, and interests in the foregoing, throughout the universe. To the extent that this assignment does not transfer all such rights under applicable law (e.g. moral rights in a jurisdiction in which an attempted transfer of moral rights is void or voidable), Reebok grants to CrossFit an irrevocable, exclusive, perpetual, royalty free, fully paid license, throughout the universe, to such non-transferable rights to CrossFit Property, including the Intellectual Property Rights related thereto. Reebok agrees to sign such documents or take such other actions reasonably requested by CrossFit, at CrossFit's expense, to evidence the ownership rights described herein. Reebok shall not permit any of its employees or independent contractors to obtain or reserve, by written or oral agreement or otherwise, any rights as "authors" or "inventors" of any artwork or designs (as such terms are used in present or future United States copyright and/or patent statutes or judicial decisions) related to the CrossFit Property. Unless expressly stated in this Agreement, CrossFit does not assign or grant any license of its CrossFit Property to Reebok.

**12.2** Ownership of Reebok Property. CrossFit acknowledges and agrees that all current and future Intellectual Property Rights throughout the universe, through any and all means, in the Reebok Property shall be the exclusive property of Reebok, from the moment of creation, whether created by, for, or on behalf of Reebok or CrossFit. For clarity, any derivatives or improvements to the Reebok Property created as a result of the activities contemplated by this Agreement will be the sole and exclusive property of Reebok. To the extent that any rights, title, or interests in and to the Reebok Property or elements thereof are not automatically owned by Reebok under any applicable law, CrossFit agrees to assign and hereby irrevocably assigns and transfers to Reebok all of its rights, title, and interests in the foregoing, throughout the universe. To the extent that this assignment does not transfer all such rights under applicable law (e.g. moral rights in a jurisdiction in which an attempted transfer of moral rights is void or voidable), CrossFit grants to Reebok an irrevocable, exclusive, perpetual, royalty free, fully paid license, throughout the universe, to such non-transferable rights to Reebok Property, including the Intellectual Property Rights related thereto. CrossFit agrees to sign such documents or take such other actions reasonably requested by Reebok, at Reebok's expense, to evidence the ownership rights described herein. CrossFit shall not permit any of its employees or independent contractors to obtain or reserve, by written or oral agreement or otherwise, any rights as "authors" or "inventors" of any artwork or designs (as such terms are used in present or future United States copyright and/or patent statutes or judicial decisions) related to the Reebok Property. Unless expressly stated in this Agreement, Reebok does not assign or grant any license of its Reebok Property to CrossFit.

23

**12.3** Registration and use of CrossFit Trademarks. CrossFit will use reasonable efforts to file and prosecute applications for trademark registrations, at CrossFit's expense, for CrossFit Trademarks in order to cover the activities contemplated by this Agreement. Specifically (without limiting the foregoing), CrossFit will timely file, and will use reasonable efforts to prosecute, at CrossFit's expense, trademark applications covering International Classes 25 and 41 for the mark CROSSFIT covering the jurisdictions listed on **Schedule E**. Reebok will have the right (but not the obligation), at Reebok's expense, to file additional applications to register CrossFit Trademarks, in CrossFit's name, as Reebok deems reasonably necessary to carry out the activities contemplated by this Agreement; provided, however, that any such actions by or on behalf of Reebok shall not imply or result in Reebok acquiring any ownership rights or other rights, title or interest in or to such trademarks, other than the license rights expressly provided in this Agreement. CrossFit and Reebok will provide timely and reasonable cooperation, at the other party's expense, including signing any necessary documents, to the other party's prosecution efforts as described above. Reebok shall legibly and durably affix to all Licensed Products the trademark notices specified in writing by CrossFit and any other legal notices which CrossFit may from time to time prescribe in writing; provided that CrossFit shall provide written notice to Reebok with respect of any change in such requirements and shall provide Reebok with a reasonable period of time to comply considering the relevant circumstances.

**12.4** Enforcement of CrossFit Trademarks. Reebok will provide reasonable assistance to CrossFit, at CrossFit's expense, in the procurement, protection, and maintenance of CrossFit's rights in and to the CrossFit Trademarks. CrossFit will have the first right (but not the obligation) to commence or prosecute and control the disposition of any claims or suits relative to the imitation, infringement, and/or unauthorized use of the CrossFit Trademarks. Reebok will cooperate with and provide reasonable assistance to CrossFit in connection with any such claims or suits at CrossFit's expense. Reebok will promptly notify CrossFit in writing of any infringement, imitations, or unauthorized use of the CrossFit Trademarks by others. CrossFit will, in its discretion, determine whether to take action and the type of action, if any, to take against such infringement; *provided, however*, that if CrossFit determines not to take any action against an infringement of one or more CrossFit Trademarks as used with the Licensed Products, Reebok will have the right (but not the obligation) to commence and prosecute such claims and suits on its own behalf and expense, and CrossFit will cooperate and assist Reebok in connection with such claims and suits at Reebok's expense. CrossFit will be entitled to recoup all of its expenses in bringing and prosecuting such action from any settlement made or damages awarded in connection with such action, and retain any remaining portion of such settlement without sharing any portion thereof with Reebok; *provided, however* that if CrossFit opts not to commence such action and Reebok commences and prosecutes such action at its own expense as provided above, Reebok will be entitled to recoup its expenses in bringing and prosecuting such action (including attorneys' and expert fees) and any remaining damages or settlement will be shared 50/50 with CrossFit. Nothing in this Section 12.4 will prevent Reebok from protecting its rights in the Licensed Products separate and apart from the CrossFit Trademarks.

**12.5** Benefit of Use. Reebok acknowledges and agrees that all use of the CrossFit Trademarks including all use of any marks, names, slogans, taglines, etc. owned by CrossFit and related to the CrossFit Property and any other CrossFit-related event, competition, program, or promotion, including any and all use by Reebok, and any goodwill generated by such use shall inure solely to the benefit of CrossFit.

24

CrossFit acknowledges and agrees that all use of the Reebok Trademarks including all use of any marks, names, slogans, taglines, etc. owned by Reebok and used in connection with the Reebok Property, including any and all use by CrossFit and any goodwill generated by such use shall inure solely to the benefit of Reebok.

**12.6** No Ownership Claim.

12.6.1 Reebok acknowledges and agrees that CrossFit shall have the sole and exclusive right to prosecute, maintain, and enforce all Intellectual Property Rights in connection with the CrossFit Property as it desires in its sole discretion, other than with respect to CrossFit Trademarks as expressly provided above. Reebok agrees that it will not assert any claim of ownership to the CrossFit Trademarks, or other CrossFit Property, or to the reputation or goodwill therein, by virtue of Reebok's use of the CrossFit Trademarks or otherwise, and agrees that it will not attempt to register the CrossFit Trademarks or any trademark, trade name, or service mark confusingly similar therewith, alone or in combination with any other written or figurative element, in any jurisdiction. If at any time Reebok acquires any rights in, or registrations of or applications for registration of, the CrossFit Trademarks, by operation of law or otherwise, it will immediately, upon written request of CrossFit, and at no expense to CrossFit, assign all such rights, registrations or applications to CrossFit along with any and all associated goodwill and right of action attaching thereto. Reebok will not use CrossFit's name, or the CrossFit Property, other than as permitted hereunder and, in particular, will not incorporate CrossFit's name, or the CrossFit Property, in Reebok's corporate or business name in any manner whatsoever. Reebok agrees that in using the CrossFit Property it will in no way represent that it has any rights, title, or interests in or to the CrossFit Property other than those expressly granted under the terms of this Agreement.

12.6.2 CrossFit acknowledges and agrees that Reebok shall have the sole and exclusive right to prosecute, maintain, and enforce all Intellectual Property Rights in connection with the Reebok Property as it desires in its sole discretion. CrossFit agrees that it will not assert any claim of ownership to the Reebok Trademarks or other Reebok Property, or to the reputation or goodwill therein, by virtue of CrossFit's use of the Reebok Trademarks or otherwise, and agrees that it will not attempt to register the Reebok Trademarks or any trademark, tradename or service mark confusingly similar therewith, alone or in combination with any other written or figurative element, in any jurisdiction. If at any time CrossFit acquires any rights in, or registrations of or applications for registration of, the Reebok Trademarks by operation of law or otherwise, it will immediately, upon written request of Reebok, and at no expense to Reebok, assign all such rights, registrations or applications to Reebok along with any and all associated goodwill and right of action attaching thereto. CrossFit will not use Reebok's name, or the Reebok Property, other than as permitted hereunder and, in particular, will not incorporate Reebok's name, or the Reebok Property, in CrossFit's corporate or business name in any manner whatsoever. CrossFit agrees that in using the Reebok Property it will in no way represent that it has any rights, title, or interests in or to the Reebok Property other than those expressly granted under the terms of this Agreement.

## 13.   CONFIDENTIAL INFORMATION

**13.1**   Each party acknowledges that, during the course of their relationship, it may learn of Confidential Information of the other party. Any such Confidential Information shall be kept confidential by the receiving party. Each party agrees to not: (1) use the Confidential Information, except as required by the normal and proper course of performing under this Agreement, (2) disclose the Confidential Information, except as otherwise expressly permitted hereunder, or (3) copy the Confidential Information without the express prior written consent of the disclosing party, except as required by the normal and proper course of performing under this Agreement. These restrictions will continue to apply as long as the confidential nature of the information is maintained.

**13.2**   Each party may disclose the Confidential Information of the other party to its officers, directors, employees and authorized subcontractors who require access to the Confidential Information for the purposes contemplated by this Agreement, provided that each party shall ensure that its officers, directors, employees and authorized subcontractors are made aware of, and sign a written agreement setting forth the confidentiality obligations of each such officer, director, employee and authorized subcontractor, which agreement shall impose obligations, responsibilities and standards upon any such officers, directors, employees and authorized subcontractors that in all material respects, are not less than those imposed in this Section 13, and each party shall be responsible for all violations of this agreement by its officers, directors, employees and authorized subcontractors.

**13.3**   Any other provision hereof to the contrary notwithstanding, it is expressly understood and agreed that the obligations of confidentiality herein assumed shall not apply to any information which:

13.3.1   is at the time of disclosure or thereafter becomes a part of the public domain through no fault of the receiving party;

13.3.2   was, as shown by written records, otherwise in the receiving party's possession prior to disclosure pursuant to or in connection with this Agreement;

13.3.3   is released in writing by the disclosing party from confidential status; or

13.3.4   the receiving party is required by any law or legal process to disclose, in which case the following shall apply;

   (a)   The receiving party shall provide the party whose Confidential Information is subject to disclosure with prompt notice of such requirement so that such party may seek a protective order or other appropriate remedy or waive compliance with the provisions of this Agreement;

   (b)   In the event that a protective order or other remedy is obtained, the receiving party shall use all reasonable efforts without expenditure of money to attempt to ensure that all information disclosed shall be covered by such order or other remedy; and

   (c)   Whether or not such protective order or other remedy is obtained or that the party whose Confidential Information is subject to disclosure waives

26

compliance with the provisions of this Agreement, the receiving Party agrees that it will disclose only that portion of the information that it is legally required to disclose.

**13.4** Each party agrees to return to the other promptly upon the termination of this Agreement, or at any other time when requested, that party's Confidential Information, including any copies thereof.

**13.5** Each party represents and warrants that entering into and performing under this Agreement does not conflict with any prior obligations to third parties regarding confidential information. Each party agrees not to disclose to or use on behalf of the other any confidential or proprietary information belonging to a third party (including prior employees, employees and customers) unless written authorization from the third party is first obtained in form and substance satisfactory to the party to whom the disclosure will be made or on whose behalf the information will be used.

## 14. REPRESENTATIONS

**14.1** Representations and Warranties of CrossFit. CrossFit represents and warrants that:

14.1.1 it has the right to negotiate this Agreement and the right to grant the rights described herein;

14.1.2 it has not entered into or granted, and it will not enter into or grant, any agreement, right or obligation which, to the best of CrossFit's actual knowledge, will prevent Reebok from exercising the rights granted to it herein;

14.1.3 it is the owner of all rights in the CrossFit Trademarks as are required to give effect to this Agreement; *provided, however*, that CrossFit does not own the "CrossFit" mark in South Africa;

14.1.4 to the best of CrossFit's knowledge, the consummation of the transactions herein contemplated and the compliance with the terms, conditions and provisions of this Agreement will not conflict with, or result in a breach of, or constitute a default under any of the terms, conditions or provisions of the certificates of incorporation, constituting documents or by-laws of CrossFit or any material agreement or instrument to which CrossFit is party or by which it is bound;

14.1.5 it has not entered into or granted, and it will not enter into or grant, any agreement, right or obligation, which, to the best of CrossFit's knowledge, will prevent it from performing its obligations herein;

14.1.6 it is duly formed and validly subsisting under the laws of its jurisdiction of its formation, and has obtained all material authorizations required in respect of its operations;

14.1.7 it has full corporate power and authority and full right to enter into and perform their obligations under this Agreement; and

14.1.8 it shall not do or cause to be done any act or thing contesting or in any way impairing or tending to impair any right, title and/or interest of Reebok or its Affiliates in or to the Reebok Property or any other Reebok product, service,

27

event, contest, program or promotion. CrossFit shall not (and shall not allow others to) utilize the Reebok Trademarks, CrossFit Reebok Gyms or the Licensed Products (in whole or in part) in such a manner that would defame, ridicule, satirize, parody or disparage the reputation of Reebok, its Affiliates, CrossFit Reebok Gyms, employees, agents or other individual or entity.

**14.2** Representations and Warranties of Reebok. Reebok represents and warrants that:

14.2.1 it is a corporation duly incorporated and organized and validly subsisting under the laws of its jurisdiction of incorporation, and has obtained all material authorizations required in respect of its operations;

14.2.2 it has full corporate power and authority and full right to enter into and perform its obligations under this Agreement;

14.2.3 it is the owner and/or licensee of such rights in the Reebok Trademarks as are required to give effect to this Agreement;

14.2.4 the consummation of the transactions herein contemplated and the compliance with the terms, conditions and provisions of this Agreement will not conflict with, or result in a breach of, or constitute a default under any of the terms, conditions or provisions of the certificates of incorporation, constituting documents or by-laws of Reebok or any material agreement or instrument to which Reebok is party or by which it is bound; and

14.2.5 Reebok has not entered into, granted or become subject to, and nor will it enter into, grant or voluntarily become subject to, any agreement, right or obligation, which will prevent Reebok from performing their obligations herein.

14.2.6 it shall comply with all applicable laws, rules and regulations.

14.2.7 it is financially sound and fiscally capable of performing its obligations, and any material change in such status shall be immediately communicated in writing to CrossFit.

14.2.8 it shall not do or cause to be done any act or thing contesting or in any way impairing or tending to impair any right, title and/or interest of CrossFit or its Affiliates in or to the CrossFit Property or any other CrossFit product, service, event, contest, program or promotion. Reebok shall not (and shall not allow others to) utilize the CrossFit Trademarks, CrossFit Reebok Gyms or the Licensed Products (in whole or in part) in such a manner that would defame, ridicule, satirize, parody or disparage the reputation of CrossFit, its Affiliates, CrossFit Gyms, employees, agents or other individual or entity.

14.2.9 the Licensed Products are and shall be safe and suitable for their intended purpose and do not and will not contain any injurious, poisonous, toxic or harmful substances and the Licensed Products are not and will not be inherently dangerous to users thereof.

## 15.  WARRANTY AND LIMITATION OF LIABILITY

   **15.1**   No Defect Warranty.  The Licensed Products shall be manufactured using industry standard or industry leading materials and processes, in accordance with product design and quality specifications suitable for the intended users.

   **15.2**   DISCLAIMER. EXCEPT AS SET FORTH HEREIN, ANY AND ALL WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, THE WARRANTIES OF MERCHANTABILITY, MERCHANTABLE QUALITY, DURABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT, ARE EXPRESSLY EXCLUDED. EXCEPT AS EXPRESSLY DESCRIBED HEREIN, NEITHER PARTY MAKES ANY WARRANTIES, EXPRESS, IMPLIED, ARISING FROM COURSE OF DEALING OR USAGE OF TRADE, OR STATUTORY, AS TO ANY MATTER WHATSOEVER. NEITHER PARTY SHALL HAVE THE RIGHT TO MAKE OR PASS ON, AND SHALL TAKE ALL MEASURES NECESSARY TO ENSURE THAT NEITHER PARTY NOR ANY OF ITS AGENTS OR EMPLOYEES SHALL PASS ON, ANY EXPRESS OR IMPLIED WARRANTY ON BEHALF OF THE OTHER PARTY TO ANY THIRD PARTIES. WITHOUT LIMITING THE FOREGOING, CROSSFIT DOES NOT ENSURE CONTINUOUS OPERATION OF THE CROSSFIT PROGRAM, CROSSFIT GAMES, APPLICATION, CROSSFIT GYMS OR CROSSFIT REEBOK GYMS, IN WHOLE OR IN PART.

   **15.3**   LIMITATION OF LIABILITY.  TO THE MAXIMUM EXTENT PERMITTED BY LAW AND OTHER THAN WITH RESPECT TO A PARTY'S INDEMNIFCATION OBLIGATIONS HEREUNDER, (A) NEITHER PARTY SHALL BE LIABLE, UNDER ANY THEORY OF CONTRACT, NEGLIGENCE, STRICT LIABILITY OR OTHER LEGAL OR EQUITABLE THEORY FOR (I) ANY LOSS OF BUSINESS, PROFITS OR GOODWILL, LOSS OF USE, OR INTERRUPTION OF BUSINESS OR (II) ANY INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES AND IRRESPECTIVE OF WHETHER THE PARTIES HAVE ADVISED OR BEEN ADVISED OF THE POSSIBILITY OF ANY SUCH LOSS OR DAMAGE, AND (B) THE TOTAL LIABILITY OF EITHER PARTY SHALL BE LIMITED TO THE ROYALTIES AND FEES PAID BY REEBOK TO CROSSFIT PURSUANT TO THIS AGREEMENT. EACH PARTY ACKNOWLEDGES AND AGREES THAT THE FOREGOING LIMITATIONS ARE AN ESSENTIAL ELEMENT OF THE BARGAIN BETWEEN THE PARTIES, AND IN THEIR ABSENCE THE ECONOMIC TERMS OF THIS AGREEMENT WOULD BE SUBSTANTIALLY DIFFERENT.

   THE SUCCESS OF THE LICENSED PRODUCTS, CROSSFIT PROGRAM, APPLICATION, CROSSFIT GAMES, CROSSFIT GYMS AND CROSSFIT REEBOK GYMS DEPENDS ON NUMEROUS FACTORS BEYOND EITHER PARTY'S CONTROL. THE PARTIES THEREFORE ACKNOWLEDGES AND AGREES THAT THE SALE, EXPLOITATION AND LICENSE OF THE LICENSED PRODUCTS, CROSSFIT REEBOK GYMS AND OTHER CROSSFIT PRODUCTS OR SERVICES DESCRIBED HEREIN IS SPECULATIVE, NEITHER PARTY MAKES ANY, AND EXPRESSLY DISCLAIMS ALL, REPRESENTATIONS AND WARRANTIES AS TO THE PROFITS, REVENUES (OTHER THAN WITH RESPECT TO REEBOK'S GUARANTEE OF MINIMUM ROYALTY PAYMENTS), RECEIPTS OR POTENTIAL SUCCESS OF ANY CROSSFIT-RELATED PRODUCT OR SERVICE,

INCLUDING, WITHOUT LIMITATION, THE CROSSFIT REEBOK GYMS, CROSSFIT GAMES AND/OR LICENSED PRODUCTS AND, EXCEPT AS SET FORTH HEREIN, NO LIABILITY SHALL BE IMPOSED UPON EITHER PARTY FOR ROYALTIES OR OTHERWISE, BASED UPON ANY FAILURE OR DELAY BY EITHER PARTY TO DEVELOP, RELEASE, DISTRIBUTE, PUBLISH, SUPPORT, OPERATE, MARKET OR PROMOTE THE LICENSED PRODUCTS, CROSSFIT PROGRAM, APPLICATION, CROSSFIT GAMES, CROSSFIT GYMS AND/OR CROSSFIT REEBOK GYMS IN ANY COUNTRY OR TERRITORY OR IN ANY ONE OR MORE LANGUAGES AND/OR BASED ON ANY CLAIM THAT (I) MORE REVENUE OR RECEIPTS COULD HAVE BEEN MADE OR EARNED AND/OR (II) BETTER PRICES OR TERMS COULD HAVE BEEN OBTAINED.

## 16. **INDEMNIFICATION**

**16.1**  CrossFit Indemnity.  CrossFit shall indemnify, defend and hold Reebok and Reebok's Affiliates and each of their respective representatives, officers, directors, licensors, licensees, agents and employees (collectively, a "**Reebok Party**") harmless from and against any and all loss, damage, liability, action, claim, judgment, settlement, cost or expense (including reasonable attorneys' fees and expenses) (collectively, "**Costs**") that a Reebok Party may incur or suffer as a result of any third party claim, suit or proceeding of any kind whatsoever (a "**Third Party Claim**") brought against any Reebok Party related to or arising out of: (a) any act or omission by CrossFit or any breach or alleged breach of any representation, warranty or covenant made by CrossFit in this Agreement or; (b) use of the CrossFit Trademarks on Licensed Products, Games Apparel, Athlete Bags, Official Gear, Fan Gear or Reebok Marketing Materials as contemplated by this Agreement (including, without limitation, third party claims for trademark infringement), unless such CrossFit Trademarks are modified by Reebok. The foregoing indemnity shall not be construed to cover any Third Party Claim with respect to which Reebok has committed to indemnify CrossFit under Section 16.2 below. Reebok agrees that it shall be Reebok's responsibility to carry out such investigation as Reebok deems appropriate to establish that the Licensed Products, packaging, promotional and advertising materials which are manufactured or created hereunder, excluding use of the CrossFit Trademarks, do not infringe such rights of any third party.

**16.2**  Reebok Indemnity.  Reebok shall indemnify, defend and hold CrossFit and CrossFit's Affiliates and each of their respective representatives officers, directors, licensors, licensees, agents and employees (collectively, a "**CrossFit Party**") harmless from and against any and all Costs that a CrossFit Party may incur or suffer as a result of any Third Party Claim brought against any CrossFit Party related to or arising out of: (a) the design, manufacture, packaging, distribution, shipment, advertising, promotion, sale, or exploitation of the Licensed Products, including, without limitation, any product liability claim or suit; (b) personal injury, damage, economic loss or other damage, caused by or arising out of the use of the Licensed Products; (c) any act or omission of Reebok or any breach or alleged breach of any representation, warranty or covenant made by Reebok in this Agreement; (d) use of the Reebok Trademarks as contemplated by this Agreement (including, without limitation, third party claims for trademark infringement); or (e) any actual or alleged infringement or violation of any Intellectual Property Right of any person or entity with respect to any Reebok Property, except to the extent arising from use of CrossFit Trademarks as authorized under this Agreement. The foregoing indemnity shall not be construed to cover any Third Party Claim with respect to which CrossFit has committed to indemnify Reebok under Section 16.1

above. Without limiting the generality of the foregoing, Reebok's indemnity shall specifically apply to Third Party Claims relating to or based upon defects in the Licensed Products, whether hidden or obvious and despite CrossFit's approval of the Licensed Products.

16.3.   Notification. Each party (the "**Notifying Party**") shall promptly notify the other party (the "**Indemnifying Party**") of the existence of any Third Party Claim giving rise to a claim of indemnification under this Section 16. The Indemnifying Party shall have sole control of the defense and settlement of the Third Party Claim. The Notifying Party shall make available to the Indemnifying Party, at the Indemnifying Party's expense, such information and assistance as the Indemnifying Party shall reasonably request in connection with the defense of a Third Party Claim. No party, however, may settle any pending or threatened proceeding in a manner which admits wrongdoing by the indemnified party without obtaining (i) an unconditional release of the indemnified party from all such liability on claims that are the subject matter of such proceeding and/or (ii) consent of the indemnified party. This Section 16 shall survive termination or expiration of this Agreement.

## 17.   **INSURANCE**

   **17.1**   Reebok Insurance. Reebok agrees to add CrossFit as an additional insured party to its product liability insurance and comprehensive general liability insurance policies. Within ninety (90) days from the date of execution of this Agreement, Reebok will cause to be submitted to CrossFit a fully paid policy or certificate of insurance naming CrossFit and its agents, servants, employees, officers and directors as an additional insured party (in respect of claims covered under the Reebok indemnity set forth above), and providing that the insurer shall not terminate or materially modify such coverage without written notice to CrossFit at least thirty (30) days in advance thereof.

   **17.2**   CrossFit Liability Insurance. CrossFit shall cause to be obtained and maintained comprehensive general liability insurance providing protection against any such claims or suits in amounts no less than $3,000,000 in the aggregate and $1,000,000 per incident. Within ninety (90) days from the date of execution of this Agreement, CrossFit will cause to be submitted to Reebok a fully paid policy or certificate of insurance naming Reebok and its agents, servants, employees, officers and directors as an additional insured party (in respect of claims covered under the CrossFit indemnity set forth above), and providing that the insurer shall not terminate or materially modify such coverage without written notice to Reebok at least thirty (30) days in advance thereof.

   **17.3**   CrossFit Risk Retention Group. Subject to the terms and conditions and then-current rules and regulations of the CrossFit Risk Retention Group (RRG), including compliance with applicable laws, rules, regulations and subject to locations and jurisdictions where such insurance policies may be issued by the CrossFit RRG, to the extent CrossFit has such control, CrossFit shall not solely identify CrossFit Reebok Gym affiliate-owners for exclusion from purchasing premiums for professional liability pursuant to such RRG program.

## 18. TERM AND INITIAL FEE

**18.1** Term. The parties agree that the Agreement shall have an initial term of ten (10) years, commencing on the Effective Date and continuing until December 31, 2020 (the "**Term**").

    18.1.1 Initial Fee. As further consideration for the rights granted to Reebok hereunder, Reebok shall pay CrossFit a non-refundable, non-recoupable fee of US$2,000,000.00 ("**Fee**"), as follows:

        (a) US$1,000,000 within ten (10) days of the mutual execution of this Agreement; and

        (b) US$1,000,000 on the first anniversary of the Effective Date.

## 19. TERMINATION

**19.1** Termination for Cause. Either party shall have the right to terminate this Agreement and the licenses granted herein effective immediately:

    19.1.1 upon the commission of a breach of any material term or covenant of this Agreement (including any representation or warranty stated herein) by the other party, which breach is not cured or resolved to the satisfaction of the aggrieved party within thirty (30) days of receipt of written notice of such breach (it being understood that, with respect to the warranty set forth in 14.2.9, Reebok's cooperation and compliance with measures ordered by the relevant authorities and/or a recall of the applicable Licensed Product shall be considered a cure for any breach of such warranty but shall not relieve Reebok of its indemnification obligations as described herein); or

    19.1.2 (i) if the other party or its creditors or any other eligible party shall file for the said party's liquidation, bankruptcy, reorganization, compulsory composition or dissolution, or if the other party has entered into liquidation, bankruptcy, reorganization, compulsory composition or dissolution, or; (ii) if the other party files a proposal or a notice of intention to make a proposal under the Bankruptcy and Insolvency Act or any similar law, or; (iii) if the other party has explicitly suspended payment of any debts as they become due, or; (iv) if the creditors of the other party have taken over its management or appointed a receiver or manager therefore; or (v) if the other party ceases to do business (excluding, acquisitions, consolidations and re-organizations), dissolves, winds-up or liquidates or approves such act.

**19.2** Damaging Statements.

    19.2.1 In addition to the rights granted it by Section 19.1, Reebok shall have the right to terminate this Agreement upon thirty (30) days prior written notice, which notice shall be provided by Reebok to CrossFit within five (5) days of Reebok learning of such disparaging statement, should any director or officer of CrossFit more than once disparage or bring into public disrepute, contempt, scandal or ridicule Reebok, its products or its role within the CrossFit Community.

    19.2.2 In addition to the rights granted it by Section 19.1, CrossFit shall have the right to terminate this Agreement upon thirty (30) days prior written notice, which

notice shall be provided by CrossFit to Reebok within five (5) days of CrossFit learning of such disparaging statement, should any director or officer of Reebok or of any Reebok Affiliate more than once disparage or bring into public disrepute, contempt, scandal or ridicule CrossFit, the CrossFit Games, CrossFit Program, CrossFit Gyms or CrossFit Reebok Gyms.

**19.3** Special Right of Termination. In addition to the rights granted it by Section 19.1 and 19.2.1, Reebok shall have the right to terminate this Agreement, effective as of December 31, 2016 if, as of December 31, 2015, the following conditions exist:

19.3.1 CrossFit does not have a national, U.S., network and/or cable television broadcast agreement (or agreements) distributing the Global CrossFit Games in primetime (or a 1.5 rating equivalent) on a network with a minimum distribution of 65 million U.S. households; or

19.3.2 The total number of CrossFit Gyms currently in existence and satisfying the affiliate requirements (inclusive of the CrossFit Reebok Gyms) is less than 4,000.

In order to exercise the special right of termination set forth in this Section 19.3, Reebok must deliver written notice of exercise to CrossFit during the period beginning on January 1, 2016 and ending on April 1, 2016 (the "**Opt Out Notice**"). In the event of such termination by Reebok, and in the event of termination as described in Section 19.4 below, such termination shall not be deemed to be termination for uncured breach by CrossFit but termination by Reebok at its convenience.

**19.4** Change of Control of CrossFit. Should CrossFit undergo a Change of Control, CrossFit shall provide Reebok with immediate written notice of such Change of Control (the "**Change of Control Notice**") and Reebok shall then have ninety (90) days from receipt of the Change of Control Notice to provide CrossFit with written notice of termination. Such termination to be effective thirty (30) days following CrossFit's receipt of such notice in accordance with Section 20.2 below. "**Change of Control**" means, with respect to CrossFit, (a) any sale, transfer, assignment, or other disposition, whether by operation of law or otherwise, of the voting or other securities, which results in any single third party (other than the stockholders as of the Effective Date) owning more than a majority of CrossFit's voting stock, (b) the sale of all or substantially all of CrossFit's business or assets in one or a series of transactions to a third party buyer, (c) a merger or consolidation of CrossFit with any other third party entity, or (d) the acquisition by a third party of the right to nominate a controlling majority of members of the board of directors of such party.

**19.5** Termination of CrossFit's Obligations. If Reebok fails to pay any amount owed to CrossFit pursuant to this Agreement, other than amounts which Reebok is disputing in good faith, and such breach is not remedied within ten (10) business days after written notice thereof has been given by CrossFit to Reebok, then CrossFit may terminate this Agreement immediately upon written notice to Reebok and shall be entitled to seek recovery from Reebok for any actual direct damages suffered or incurred by CrossFit arising out of Reebok's breach.

**19.6** IN NO EVENT SHALL REEBOK HAVE ANY RIGHT TO: (i) RECOVER OR OBTAIN ANY RIGHTS IN OR TO THE CROSSFIT PROPERTY, CROSSFIT REEBOK GYMS (OTHER THAN AS DESCRIBED IN SECTION 3 HEREIN) OR ANY OTHER CROSSFIT PRODUCT, SERVICE OR PROGRAM WHICH MAY CONTAIN OR HAVE INTEGRATED ALL OR PART OF THE REEBOK

TRADEMARKS PURSUANT TO THIS AGREEMENT OR ANY INTELLECTUAL PROPERTY RIGHTS IN AND TO THE FOREGOING (OTHER THAN REEBOK PROPERTY), OR (ii) ENJOIN CROSSFIT'S DEVELOPMENT, PROGRAMMING, LICENSING, USE, PUBLISHING, MARKETING, DISTRIBUTION OR EXPLOITATION OF THE CROSSFIT PROGRAM, CROSSFIT GAMES, APPLICATION, CROSSFIT GYMS, CROSSFIT REEBOK GYMS (OTHER THAN AS DESCRIBED IN SECTION 3 HEREIN) AND/OR ANY OTHER CROSSFIT PRODUCT, SERVICE OR PROGRAM (OTHER THAN REEBOK PROPERTY) AND/OR ANY RIGHTS ASSIGNED, TRANSFERRED OR RESERVED TO CROSSFIT HEREUNDER.

**19.7**   Effect of Termination.

19.7.1   Upon the expiry or termination of this Agreement (the "**Expiration Date**"), the parties shall, except as expressly provided herein, cease all use of the other party's trademarks and Reebok shall cease promoting itself as a sponsor of the CrossFit Games. On expiration or termination of this Agreement, all payments owed to CrossFit will be due and payable within sixty (60) days.

19.7.2   On expiration or termination of this Agreement, all Royalties then due and owing (including unpaid portions of the Guarantee, if any) shall be immediately due and payable without set-off of any kind and no Guarantee paid to CrossFit shall be refunded to Reebok. Should this Agreement be terminated, Reebok shall owe CrossFit a pro-rated portion of any unpaid Guarantee amounts for the year in which the Agreement is terminated. Upon expiration of the Term, and in the event of its sooner termination, thirty (30) business days after receipt of written notice of termination, a statement showing the number and description of Licensed Products on hand or in process shall be furnished by Reebok to CrossFit.

19.7.3   Except in the event of termination of this Agreement by CrossFit, Reebok shall have a period of one hundred sixty (160) days commencing with the expiration date or effective date of such early termination (the "**Sell-Off Period**"), in which to sell-off (on a non-exclusive basis) Licensed Products which are on hand or in process as of the expiration date; *provided, however*: (i) Reebok complies with all the terms and conditions of this Agreement, including, but not limited to, Reebok's obligation to pay Royalties on and to account to CrossFit for such sales (such accounting to be provided to CrossFit within thirty (30) days after the expiration of the Sell-Off Period) and (ii) Reebok has not manufactured Licensed Products solely or principally for sale during the Sell-Off Period. Royalties earned during the Sell-Off Period may not be applied to any Guarantee shortfall. During the sell-off period, CrossFit may use or license the use of the CrossFit Trademarks in any manner, at any time, anywhere in the world.

19.7.4   If Reebok has remaining inventory of the Licensed Products upon termination of this Agreement by CrossFit or after the expiration of the Sell-Off Period, CrossFit may, at its option: (a) purchase all or any portion of the remaining inventory at Reebok's cost or (b) require Reebok to destroy such inventory at Reebok's expense and furnish CrossFit with an affidavit signed by an officer of Reebok attesting to such destruction. CrossFit shall have the right, at any time promptly following its termination of the Agreement or during the Sell-Off Period, if any, to conduct a physical inventory of the Licensed Products. If Reebok refuses to permit such physical inventory or to furnish the statement

required in Section 19.5.2 above, Reebok shall forfeit its right to any Sell-Off Period. On expiration or termination of this Agreement, except as noted in Section 19.5.3 above or otherwise expressly stated in this Agreement, Reebok shall have no further right to exercise the rights licensed hereunder or otherwise granted in relation to this Agreement and such rights shall forthwith revert to CrossFit. All Confidential Information and other materials supplied to Reebok by CrossFit hereunder shall be immediately returned to CrossFit at Reebok's expense or be destroyed within five (5) business days. Reebok shall within five (5) business days after such destruction deliver to CrossFit a certificate of destruction evidencing same. Reebok agrees that (i) its failure to cease the manufacture, sale and/or distribution of Licensed Products upon the expiration or termination of this Agreement will result in immediate and irreparable damage to CrossFit, (ii) there is no adequate remedy at law for such failure and (iii) in the event of such failure, CrossFit shall be entitled to injunctive relief.

19.7.5 Upon expiration or termination of this Agreement, (i) CrossFit shall be free to license others to use the CrossFit Trademarks in connection with the manufacture, sale, distribution and promotion of goods and services in the Territory (including those goods listed on **Schedule C**), and (ii) Reebok shall refrain from further use of the CrossFit Trademarks or any further reference, direct or indirect, thereto in connection with the manufacture, sale, distribution or promotion of Reebok's Products except as permitted in Section 19.5.3 above or as otherwise expressly allowed under this Agreement.

## 20. GENERAL TERMS

**20.1** Entire Agreement. This Agreement constitutes the entire agreement between the parties with respect to the subject matter thereof and supersedes all prior and contemporaneous communications, whether oral or written.

**20.2** Written Approvals; Notice. In all instances hereunder in which the written approval of a party is required, the parties hereby agree that an electronic mail for the approving party shall suffice. All notices which a party hereto is required or may desire to give to the other shall be given by addressing the same to the other party at the address below written, or at such other address as may be designated in writing or by telefax message by such party in a notice to the other given in the manner prescribed in this paragraph. All such notices shall be sufficiently given for all purposes upon the earlier of: (i) the date of actual receipt; (ii) when the same shall be received by telefax message as confirmed by transmission receipt; (iii) if delivered by overnight mail by a reputable carrier (e.g., Federal Express), the next business day the overnight carrier regularly makes deliveries; or (iv) registered or certified mail, return receipt requested.

TO CROSSFIT:

TO REEBOK:

CrossFit, Inc.
8311 E. Via de Ventura, #2065
Scottsdale, AZ 85258
Attn: General Counsel
Facsimile: (508) 443-9493

Reebok International Ltd.
1895 J.W. Foster Blvd,
Canton, Massachusetts 02021
Attn: Legal Department
Facsimile: ( 781 ) 401-4780

**20.3** Assignment. This Agreement shall not be assigned or transferred, in whole or in part, by either party, without prior written consent of the other party; provided,

however, that Reebok shall be free to assign this Agreement, in whole or in part, to an Affiliate without CrossFit's prior written consent and CrossFit shall be free to assign this Agreement, in whole or in part, to an Affiliate or as part of a sale of securities in a bona fide financing transaction , consolidation, reorganization, recapitalization, merger or the sale of all or substantially all of its assets or stock. Subject to the foregoing, any attempt to assign this Agreement shall be null and void.

**20.4** Effect of Agreement. Subject to Section 20.3, this Agreement shall inure to the benefit of, and be binding upon the parties hereto and their respective successors and permitted assigns.

**20.5** Further Assurance. The parties hereto agree to sign all such further documents as may be reasonably requested by the other party to give full effect to this Agreement.

**20.6** Severability. If any term, clause, or provision of this Agreement shall be judged to be invalid or unenforceable, the validity or enforceability of any other term, clause or provision shall not be affected; and such invalid or unenforceable term, clause or provision shall be replaced with an enforceable clause which most closely achieves the result intended by the invalid clause.

**20.7** Amendment. Any amendment or modification to this Agreement must be made in writing and signed by both parties.

**20.8** Independent Contractors. Each party shall in all matters relating to this Agreement be and act as an independent contractor (i.e. the parties are acting independently of each other and neither is the agent of the other). Neither party is an agent, partner or employee of the other party and neither party has any right or any other authority to enter into any contract or undertaking in the name of or for the account of the other party or to assume or create any obligation of any kind, express or implied, on behalf of the other party, nor will the act or omissions of either create any liability for the other party. The Agreement shall in no way constitute or give rise to a partnership between the parties.

**20.9** Survival. The provisions of Sections 3.1, 3.3, 7.2, 9.3, 12.1, 12.2, 12.5, 12.6, 13, 15, 16, 17.3, 19.6, 19.7 and 20 and those sections which by their nature are intended to do so shall survive termination of this Agreement.

**20.10** Governing Law; Venue; Dispute Resolution. All issues and questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by, and construed in accordance with the laws of the State of New York and the laws of the United States applicable therein, without giving effect to any choice of law, rules or provisions (whether in any such province or any other jurisdiction) that would cause the application of the laws of jurisdiction other than the State of New York. The parties will work in good faith to settle any dispute that arises under this Agreement. If the parties are unable to resolve any dispute between them despite their good faith efforts to do so, then such dispute will be submitted to non-binding mediation before a professional mediator acceptable to both parties. Mediation will be conducted in San Diego, California if such action is brought by Reebok and in Boston, Massachusetts if such action is brought by CrossFit, within 30 business days after it is demanded by either party, or as soon thereafter as an acceptable mediator is available, and will be attended by at least one business person with decision-making authority for each party who is familiar with

36

the matters in dispute. If a mediator cannot be selected by agreement of the parties, the parties consent to the appointment of a qualified mediator by the American Arbitration Association. Each party will bear its own costs and 50% of the costs and fee due to the mediator.

Notwithstanding anything to the contrary herein, with respect to any claim arising from or related to this Agreement, Reebok hereby irrevocably waives any right or remedy to seek and/or obtain injunctive or other equitable relief or any order with respect to, and/or to enjoin or restrain or otherwise impair in any manner, the CrossFit Program (including any seminars or certifications related thereto), the CrossFit affiliation program, the Application, the CrossFit Games, any CrossFit-related fitness or sporting event or contest and/or any CrossFit Gyms, including, without limitation, the production, distribution, exhibition, display, commercialization, marketing, advertising, promotion, use, operation or other exploitation of any of the foregoing or any other product, event or service related to CrossFit, its parents, subsidiaries and Affiliates. The provisions of this paragraph shall supersede any inconsistent provisions of any prior agreement between the parties.

THE PARTIES HEREBY WAIVE THEIR RIGHT TO JURY TRIAL WITH RESPECT TO ALL CLAIMS AND ISSUES ARISING OUT OF OR RELATING TO THIS AGREEMENT WHETHER SOUNDING IN CONTRACT OR TORT, AND INCLUDING ANY CLAIM FOR FRAUDULENT INDUCEMENT THEREOF.

**20.11** Force majeure. Except for the Reebok obligation to make payments to CrossFit as described herein, Reebok and CrossFit shall not be responsible for delay, non-delivery, or failure to perform in whole or in part due to any cause beyond its reasonable control, including, without limitation, if occasioned by strikes, acts of terrorism, war (whether declared or not), riot, or revolutions, or for any delay in transportation due to embargoes of the United States Government, or any other government lockouts, stoppage of labor, or by refusal of any necessary license or government restrictions considered as "force majeure", provided that the delayed party: (a) gives the other party prompt notice of such cause, and (b) uses its reasonable commercial efforts to promptly correct such failure or delay in performance. In the event that said condition (impossibility to perform) continues for a period in excess of 60 days, either party may terminate this Agreement upon thirty (30) days prior written notice to the other party. Reebok and CrossFit agree termination pursuant to this Section 20.11 shall be without recourse to the other party; provided, however, that Reebok shall not be relieved of any payments or Royalties due or owing to CrossFit as of the effective date of such termination and shall promptly pay all such amounts to CrossFit.

**20.12** Waiver; Cumulative Remedies. No failure or delay by either party in exercising any right, power or remedy under this Agreement shall operate as a waiver of any such right, power, or remedy. No waiver of any provision of this Agreement shall be effective unless in writing and signed by the party against whom such waiver is sought to be enforced. Any waiver by either party of any provision of this Agreement shall not be construed as a waiver of any other provision of this Agreement, nor shall such waiver operate as or be construed as a waiver of such provision respecting any future event or circumstances. Except as otherwise expressly provided herein, all remedies provided for in this Agreement shall be

cumulative and in addition to and not in lieu of any other remedies available to either party at law, in equity or otherwise.

20.13 <u>Contract Interpretation</u>.   Any inconsistencies, ambiguities, or conflicts in this Agreement shall not be strictly construed against the drafter of the language but will be resolved according to its fair meaning.   In the event of any inconsistency, ambiguity or conflict between the terms of this Agreement and any Schedule hereto, the terms of this Agreement shall control.  In this Agreement, the term "will" means "shall" and vice versa.  The term "including" means "including, without limitation".

20.14 <u>Counterparts; Facsimile</u>.   This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which, when taken together, shall constitute one and the same instrument.  Execution and delivery of this Agreement may be evidenced by facsimile transmission.

**IN WITNESS WHEREOF** this Agreement has been duly executed by the parties hereto as of the day and year first above written.

CROSSFIT, INC.

By: _____
    Greg Glassman, CEO

REEBOK INTERNATIONAL LTD

By: _____
    Ulrich Becker, CEO and President

By: _____
    Matt O'Toole, Chief Marketing Officer

SCHEDULE A
CROSSFIT TRADEMARKS

CROSSFIT
FORGING ELITE FITNESS
3,2,1..GO!

SCHEDULE B
REEBOK TRADEMARKS

SCHEDULE C(i)
EXCLUSIVE LICENSED PRODUCTS

All products included in United States Patent and Trademark Office International Class 25.  See list
attached for illustrative purposes.

SCHEDULE C(ii)
NON-EXCLUSIVE LICENSED PRODUCTS
All products included in United States Patent and Trademark Office International Class 18.See list
attached for illustrative purposes.

SCHEDULE D
REEBOK COMPETITORS

adidas
Aetrex
Airwalk
American Sporting Goods
American Apparel
And 1
ASG
ASICS
Athleta
Avia
Bike
Billabong
Body Master
British Knights
Brooks
Champion –C9
Champion/Jogbra
Columbia
Converse
Crunch
Descente
Diadora
Etonic
Fila
Foot-Joy
Gilda Marx
Gildan Activewear
Hi-Tec
Hurley
Innov8
IXSPA
Kaepa
Keds/Pro Keds
Keen
K-Swiss
L.A. Gear

Lotto
Lucy
Lulu Lemon
Majestic Athletic
Merrell
Mizuno
Moda Prima
Moving Comfort
Skins
New Balance
New Era
Nike
Pony
Puma
Quiksilver
Roxy
Russell
Ryka
Salomon
Saucony
Speedo
Starter
Stride Rite
Terra Plana
Timberland
Title Nine
Tommy Hilfiger
Tretorn
Umbro
Under Armour
Vans
VF Corporation
VF Knitwear
Vibram
Zoot Sports
Zumba

SCHEDULE E
KEY MARKETS FOR CROSSFIT GAMES

Priority 1 Countries
UK
Germany
France
Russia
Spain
Italy
Nordics
Korea
Japan
México
India

Priority 2 Countries
Brazil
China

SCHEDULE F

INVENTORY

## International Classification of Goods and Services Under the Nice Agreement

### Class 25 - *clothing, footwear, headgear*

Representative descriptions:

| | |
|---|---|
| A0389 | Aprons [clothing] |
| A0464 | Ascots |
| B0008 | Babies' pants |
| B0097 | Bandanas [neckerchiefs] |
| B0175 | Bath robes |
| B0178 | Bath sandals |
| B0179 | Bath slippers |
| B0184 | Bathing drawers |
| B0185 | Bathing suits |
| B0186 | Bathing trunks |
| B0289 | Belts [clothing] |
| B0551 | Boot uppers |
| B0552 | Boots * |
| B0555 | Boots for sports * |
| B0660 | Brassieres |
| C0064 | Camisoles |
| C0104 | Caps [headwear] |
| C0592 | Clothing * |
| C0632 | Coats |
| C1139 | Cyclists' clothing |
| F0420 | Football boots |
| F0428 | Footwear * |
| G0174 | Gloves [clothing] |
| H0117 | Hats |
| H0128 | Headbands [clothing] |
| H0287 | Hosiery |
| J0001 | Jackets [clothing] |
| J0026 | Jerseys [clothing] |
| K0054 | Knitwear [clothing] |
| L0149 | Leggings |
| M0335 | Mittens |
| N0034 | Neckties |
| O0131 | Overalls |
| O0132 | Overcoats |
| P0060 | Pajamas (Am.) |

3

P0086    Pants
P0134    Parkas
P0759    Pullovers
S0140    Scarves
S0338    Shirts
S0362    Shoes *
S0527    Skull caps
S0619    Socks
S1099    Sweaters
S1113    Swimsuits
T0120    Tee-shirts
T0235    Tights
U0018    Underwear
U0023    Uniforms
V0119    Vests
W0369    Wristbands [clothing]

**Class 18 – *Leather and imitations of leather, and goods made of these materials and not included in other classes; animal skins, hides; trunks and travelling bags; umbrellas, parasols and walking sticks; whips, harness and saddlery.***

Representative descriptions:

| | |
|---|---|
| A0485 | Attaché cases |
| B0013 | Backpacks |
| B0040 | Bags for campers |
| B0041 | Bags for climbers |
| B0043 | Bags for sports* |
| B0213 | Beach bags |
| B0298 | Belts (Leather shoulder —) |
| B0697 | Briefcases |
| C0204 | Cases, of leather or leatherboard |
| C0321 | Chain mesh purses |
| C0989 | Covers (Umbrella —) |
| G0026 | Game bags [hunting accessories] |
| G0046 | Garment bags for travel |
| H0060 | Handbags |
| K0016 | Key cases [leatherware] |
| M0485 | Music cases |
| P0129 | Parasols |
| P0528 | Pocket wallets |
| P0607 | Pouches, of leather, for packaging |
| P0790 | Purses |
| R0369 | Rucksacks |
| S0096 | Satchels (School —) |
| S0146 | School bags |
| S0148 | School satchels |
| S0372 | Shopping bags |
| S0571 | Slings for carrying infants |
| S1037 | Suitcases |
| T0350 | Tool bags of leather, empty |
| T0442 | Travelling bags |
| T0444 | Travelling sets [leatherware] |
| T0445 | Travelling trunks |
| T0502 | Trunks [luggage] |
| U0011 | Umbrellas |
| V0012 | Valises |
| V0031 | Vanity cases, not fitted |
| W0024 | Walking sticks |
| W0037 | Wallets (Pocket —) |



Exhibit 7.1

eStore: Product Journey

**Amendment to License and Sponsorship Agreement**

This Amendment, effective as of March 3, 2011, is made by and among Reebok International Ltd. and Reebok International Limited (collectively, "Reebok") and CrossFit, Inc. ("CrossFit"). Reference is made to that certain License and Sponsorship Agreement, effective as of September 25, 2010 and entered into between Reebok and CrossFit (the "Sponsorship Agreement"). Capitalized terms used herein and not otherwise defined shall have the meaning given such term in the Sponsorship Agreement.

WHEREAS, pursuant to the Sponsorship Agreement CrossFit has granted Reebok certain sponsorship rights and Reebok has taken on certain sponsorship obligations with respect to the CrossFit Games and beginning with the 2012 CrossFit Games;

WHEREAS, the parties now wish to amend the Sponsorship Agreement such that Reebok's rights and obligations with respect to the CrossFit Games will begin with the 2011 CrossFit Games;

NOW, THEREFORE, in consideration of the foregoing premises, together with the covenants hereinafter recited and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.  Section 4.1 of the Sponsorship Agreement ("Appointment as Title Sponsor") is hereby amended by deleting the year "2012" and inserting the year "2011" in its place.

2.  Section 4.10 of the Sponsorship Agreement ("Sponsor Obligations") is hereby amended to include the following column (representing the purse, cash and endorsement amounts for the 2011 CrossFit Games) in the table set forth therein:

| 2011 |
|---|
| $1.0 |
| $0.7 |
| $.300 |

3.  Section 4.10 of the Sponsorship Agreement ("Sponsorship Obligations") is hereby further amended by inserting the following sentence at the end thereof:

    "With regard to the Cash Sponsorship Fee due for the 2011 CrossFit Games, Reebok shall pay the full amount of such Cash Sponsorship Fee as soon as reasonably practical following execution of this Amendment, and in any event no later than March 31, 2011."

4.  Section 4 of the Sponsorship Agreement ("Sponsorship of CrossFit Games") is hereby amended by adding the following Section 4.11 thereto:

    "4.11   2011 CrossFit Games. Reebok shall use commercially reasonable efforts to meet its obligations with respect to the Games Apparel and Athlete Bags for the 2011 Regional CrossFit Games and the Official Gear for the 2011 CrossFit Games but its failure to do so

will not be considered a breach of this Agreement; *provided, however* that if Reebok fails to satisfy such obligations, then CrossFit's obligations with respect to Games Apparel requirements for the 2011 CrossFit Games as described in Section 4.3 shall be null and void."

5.   Section 8.5 of the Sponsorship Agreement ("Reebok Marketing Commitment") is hereby amended to include the following column (representing Reebok's marketing commitment for 2011) in the table set forth therein:

| 2011 |
|------|
| $4.0M |

6.   Section 8.5 of the Sponsorship Agreement ("Reebok Marketing Commitment") is hereby further amended by inserting the following sentence at the end thereof:

Reebok's failure to spend the full $4.0M marketing commitment for 2011 will not be considered a breach of this Agreement; *provided, however,* that any portion of the $4.0M not spent in 2011 will be rolled over and added to the marketing commitment amount for 2012.

7.   Other Provisions.  All other provisions of the Sponsorship Agreement, except those specifically amended hereby, remain in full force and effect in accordance with their terms.

8.   Governing Law.  This Amendment shall be governed by and construed in accordance with the internal laws of the State of New York.


REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

IN WITNESS WHEREOF, each of the parties hereto has caused this Amendment to be executed by a duly authorized person.

**REEBOK INTERNATIONAL LTD.**

By: _____
Name: Ulrich Becker
Title: President

By: _____
Name: Matt O'Toole
Title:   Chief Marketing Officer

**REEBOK INTERNATIONAL LIMITED**

By: _____
Name:  John Warren

**CROSSFIT, INC.**

By: _____
Name:  Steve Weiss
Title:  Counsel

## AMENDMENT NO. 2 TO LICENSE AND SPONSORSHIP AGREEMENT

**THIS AMENDMENT NO. 2** (this "Amendment") is entered into as of September 19, 2012 (the "Effective Date") by and among Reebok International Ltd. and Reebok International Limited (collectively, "Reebok") and CrossFit, Inc. ("CrossFit"). Reference is made to that certain License and Sponsorship Agreement, effective as of September 25, 2010 and entered into between Reebok and CrossFit (the "Sponsorship Agreement"). Capitalized terms used herein and not otherwise defined will have the meaning given such terms in the Sponsorship Agreement.

WHEREAS, the parties wish to amend the Sponsorship Agreement in certain respects.

NOW THEREFORE, in consideration of these circumstances, the promises and covenants that follow, and other consideration the adequacy of which is hereby acknowledged, the parties now agree as follows:

1.    **Section 2.2** of the Sponsorship Agreement (Compliance) is hereby deleted and replaced with the following:

2.2    Compliance. Reebok shall comply with CrossFit's written guidelines and other written instructions timely provided to Reebok on proper usage of the CrossFit Trademarks (the "CrossFit Usage Guidelines"); provided that CrossFit shall provide written notice to Reebok with respect to any change in such CrossFit Usage Guidelines and shall provide Reebok with a reasonable period of time to comply considering the relevant circumstances. Reebok will use jurisdictionally-appropriate trademark notices (®, TM or the long form "[Mark] is a [registered] trademark of CrossFit, Inc.") on all (a) advertising materials incorporating CrossFit Trademarks and (b) hang tags or packaging (one or the other) for Licensed Products. Reebok will not be required to produce multiple versions of trademark notices for Licensed Products and advertising materials sold/used in more than one jurisdiction (i.e., the TM symbol will be used if the applicable mark is not registered in all relevant jurisdictions). If Reebok does not include a trademark notice adjacent to the Reebok Trademarks appearing directly on Licensed Products, Reebok is not required to include a trademark notice adjacent to the CrossFit Trademarks appearing directly on such Licensed Products. If Reebok does not include a trademark notice for the Reebok Trademarks on a particular piece of advertising material or hang tag or packaging because it is not reasonably practicable to do so (e.g., due to space constraints), Reebok is not required to include a trademark notice for the CrossFit Trademarks on that particular piece of advertising, hang tag, or packaging; provided that Reebok notifies CrossFit in advance. If Reebok inadvertently fails to comply with the requirements above, such failure will not be considered a material breach of this Agreement if Reebok uses commercially reasonable efforts to promptly remedy the situation upon receipt of notice from CrossFit (e.g., by making a running change to hang tag production). CrossFit will provide Reebok with updated information on trademark registration status on a periodic basis, but not less frequently than semi-annually.

2.    **Section 4.2** of the Sponsorship Agreement (Identification as Title Sponsor) is hereby amended to delete the phrase "The CrossFit Reebok Games" and replace it with "The Reebok CrossFit Games".

3.    A new **Section 7.4** is hereby added:

7.4.    Responsibilities. Notwithstanding anything in this Section 7 to the contrary, the parties hereby acknowledge and agree that CrossFit's privacy policy and terms of use as provided to Reebok (the "CrossFit Policies") shall govern operation of the On-Line Store. CrossFit represents and warrants that the CrossFit Policies will comply with any and all applicable laws, rules, and regulations. For clarity, CrossFit will indemnify the Reebok Parties pursuant to Section 16.1 in the event of a Third Party Claim arising out of or relating to (a) the allegation that the CrossFit Policies violate applicable law, or (b) CrossFit's breach or alleged breach of the CrossFit Policies. Reebok will indemnify the CrossFit Parties pursuant to Section 16.2 in the event of a Third Party Claim arising out of or relating to (a) the allegation that Reebok's operation of the On-Line Store, including fulfillment of orders and withholding and remittance of applicable taxes, violates applicable law or (b) Reebok's breach or alleged breach of the CrossFit Policies.

4.    A new **Section 12.7** is hereby added:

12.7    The Sport of Fitness Marks.

12.7.1  Reebok agrees to assign to CrossFit on or before January 1, 2014, any and all of its rights, title, and interests in and to the trademarks THE SPORT OF FITNESS and THE SPORT OF FITNESS HAS ARRIVED with respect to services in International Class 41 (the "Class 41 Marks"), including all goodwill associated therewith, and including assignment of trademark applications and/or registrations. Reasonably promptly after January 1, 2014, the parties will cooperate to file assignment documents with applicable trademark offices and take such other actions as reasonably necessary to evidence the foregoing assignment. CrossFit agrees to reimburse Reebok for Reebok's reasonable out of pocket expenses (including legal fees) related to dividing (where applicable) and assigning such applications and/or registrations pertaining to the Class 41 Marks.

12.7.2  Reebok acknowledges and consents to CrossFit's use of the Class 41 Marks through December 31, 2013 in a manner consistent with the high quality of CrossFit's current materials promoting fitness services and CrossFit's other current uses of the Class 41 Marks (including without limitation use by CrossFit Gyms). Beginning January 1, 2014 through the end of the Term, CrossFit hereby grants to Reebok the non-transferable, sublicensable, royalty-free limited license to use and otherwise Exploit the Class 41 Marks solely in conjunction with the CrossFit brand and CrossFit services, and subject to CrossFit's approval which will not be unreasonably withheld. The parties will follow the process in Section 10.2 with respect to submitting materials for CrossFit's approval. During the Term, CrossFit will not grant a license in the Class 41 Marks to any Reebok Competitors.

2

12.7.3. During the Term, Reebok will remain the owner of the trademarks THE SPORT OF FITNESS and THE SPORT OF FITNESS HAS ARRIVED with respect to goods in International Classes 25 and 18 (the "Class 25 Marks"). At the end of the Term, Reebok will assign to CrossFit all of its rights, title, and interests in and to the Class 25 Marks, including all goodwill associated therewith, and including assignment of trademark applications and/or registrations. Reasonably promptly after the end of the Term, the parties will cooperate to file assignment documents with applicable trademark offices and take such other actions as reasonably necessary to evidence the foregoing assignment. CrossFit agrees to reimburse Reebok for Reebok's reasonable out of pocket expenses (including legal fees) related to assigning such applications and/or registrations pertaining to the Class 25 Marks.

12.7.4. For clarity, Reebok will be free to use and Exploit the Class 25 Marks during the Term in connection with Reebok footwear, apparel, headwear, and bags without consent from or payment to CrossFit; and CrossFit will be free to use and Exploit (a) the Class 41 Marks in connection with CrossFit services during and after the Term and (b) the Class 25 Marks in connection with CrossFit products after the Term, without consent from or payment to Reebok. During the Term, CrossFit will have responsibility for prosecution, enforcement, and defense of the Class 41 Marks, and Reebok will have responsibility for prosecution, enforcement, and defense of the Class 25 Marks; *provided, however,* that the parties will cooperate in good faith on prosecution, enforcement, and defense efforts for the Class 41 Marks and Class 25 Marks. At CrossFit's reasonable request and at CrossFit's expense, Reebok will file additional trademark applications during the Term in International Classes 25 and 18 in jurisdictions where Reebok has not already filed applications. The Class 41 Marks and Class 25 Marks will not be added to Schedule A or Schedule B, as their use and ownership are governed by this Section 12.7.

12.7.5. Reebok will not object to the promotional use of THE SPORT OF FITNESS by individual CrossFit Gyms on Open Category Products, provided that such use is consistent with the terms of Section 2.1.2. The parties agree that such promotional use by individual CrossFit Gyms will be considered use of the Class 41 Marks under the CrossFit Gyms' license agreements from CrossFit. Reebok provides no representation or warranty, and will not indemnify CrossFit or any individual CrossFit Gym, with respect to use of THE SPORT OF FITNESS by individual CrossFit Gyms.

12.7.5. Each party agrees, upon request and at the requesting party's expense, to cooperate and perform any further acts, deeds, and things, and to execute and deliver any documents that may from time to time be reasonably necessary or otherwise reasonably required to consummate, evidence, confirm, and/or carry out the intent and provisions of this Section 12.7.

5.   Schedule A and Schedule B are hereby deleted and replaced with the attached Schedules.

6.   Except as amended or supplemented herein, all provisions of the Sponsorship Agreement remain in full force and effect.

3

IN WITNESS WHEREOF, each of the parties hereto has caused this Amendment to be executed by a duly authorized person.

REEBOK INTERNATIONAL LTD.

By: _____

Name: Matt O'Toole

Title: CMO

Date: 10/25/11

By: _____

Name: Chris Froio

Title: VP, Reebok

Date: Oct. 25, 2012

REEBOK INTERNATIONAL LIMITED

By: _____

Name: John Warren

Title: Director

Date: 10/25/2012

CROSSFIT, INC.

By: _____

Name: Greg Glassman

Title: CEO, CrossFit, Inc.

Date: 1 OCT 2012

4

SCHEDULE A
CROSSFIT TRADEMARKS

CROSSFIT
FORGING ELITE FITNESS
3,2,1...GO!
FITTEST ON EARTH
FORGING THE FUTURE OF FITNESS
FIGHT GONE BAD

SCHEDULE B
REEBOK TRADEMARKS

REEBOK
ZIGTECH
REALFLEX
EASYTONE
PLAYDRY
PLAYICE
PLAYSHIELD
PLAYWARM
SMOOTHFIT
SMOOTHFLEX
U-FORM
ZIG
ZIGLITE
ZIGNANO







6

Amendment No. 3 to License and Sponsorship Agreement

This Amendment, effective as of July 3, 2014, is made by and among Reebok International Ltd. and Reebok International Limited (collectively, "Reebok") and CrossFit, Inc. ("CrossFit"). Reference is made to that certain License and Sponsorship Agreement, effective as of September 25, 2010 and entered into between Reebok and CrossFit (the "Sponsorship Agreement") and as amended to date. Capitalized terms used herein and not otherwise defined shall have the meaning given such term in the Sponsorship Agreement.

WHEREAS, the parties wish to amend the Sponsorship Agreement in certain respects;

NOW, THEREFORE, in consideration of the foregoing premises, together with the covenants hereinafter recited and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.   The table set forth in Section 4.10 of the Sponsorship Agreement ("Sponsor Obligations") is hereby deleted in its entirety and the following inserted in lieu thereof (amounts in millions):

|  | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| Purse | $1.0 | $1.0 | $1.0 | $1.75 | $2.0 | $2.2 | $2.4 | $2.6 | $2.8 | $3.0 |
| Cash Sponsorship Fee | $0.7 | $0.8 | $1.0 | $1.2 | $1.5 | $1.7 | $2.0 | $2.35 | $2.6 | $3.0 |
| Endorsements | $.300 | $.300 | $.300 | $.300 | $.300 | $.300 | $.3 | $.400 | $.400 | $.500 |

2.   Section 4 of the Sponsorship Agreement ("Sponsorship of CrossFit Games") is hereby amended by adding the following Section 4.12 thereto:

"4.12   Medal Ceremony.  CrossFit shall ensure that all athletes appearing in the medal ceremony at the Global CrossFit Games shall wear only Games Apparel during such ceremonies."

3.   The table set forth in Section 8.5 of the Sponsorship Agreement ("Reebok Marketing Commitment") is hereby deleted in its entirety and the following inserted in lieu thereof:

|  | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| Marketing | $4.0M | $6.6M | $7.7M | $7.05M | $7.9M | $8.8M | $9.7M | $10.6M | $11.5M | $12.4M |

4.   The first sentence of Section 4.2 of the Sponsorship Agreement ("Identification of Title Sponsor") is hereby amended and restated in its entirety as follows:

"The CrossFit Games shall be branded as "The Reebok CrossFit Games" in a form to be mutually agreed upon by the parties and generally based on the form as shown on Appendix A, as may be and providing for year to year modifications to such logo to reflect the look and feel of the CrossFit Games, as determined by CrossFit, and such mutually-agreed upon logo (the "Games Logo") will be used in relevant promotional communications related to the CrossFit Games, including, but not limited to, advertisements, print, radio and television materials, brochures, flyers, press releases, programs and other promotional materials of any kind or description in any way produced by CrossFit in association with the CrossFit Games."

5. **Other Provisions.** All other provisions of the Sponsorship Agreement, except those specifically amended hereby, remain in full force and effect in accordance with their terms.

6. **Governing Law.** This Amendment shall be governed by and construed in accordance with the internal laws of the State of New York.

IN WITNESS WHEREOF, each of the parties hereto has caused this Amendment to be executed by a duly authorized person.

REEBOK INTERNATIONAL LTD.

By: _____
Name: Matt O'Toole
Title: President

By: _____
Name: Chris Froio
Title:   Vice President, Training

CROSSFIT, INC.

By: _____
Name: Steve Way
Title: Corporate Designat

REEBOK INTERNATIONAL LIMITED

By: _____
Name:  John Warren

# EXHIBIT B

| | |
|---|---|
| **From:** | Matt Holdsworth |
| **To:** | Steve Weiss |
| **Subject:** | Fwd: April - June 2016 CF Royalty Statement |
| **Date:** | Thursday, September 22, 2016 2:53:44 PM |
| **Attachments:** | Apr - Jun 2016 CF Royalty Statement Recalculated.xlsx |

Emails about last royalty statements.

---------- Forwarded message ----------
From: **Matt Holdsworth** <matt.holdsworth@crossfit.com>
Date: Tuesday, August 30, 2016
Subject: April - June 2016 CF Royalty Statement
To: "Thornton, Craig" <craig.thornton@reebok.com>


Dear Craig,

Recently we reviewed the Apr - Jun 2016 CF Royalty Statement and found that some of the
rows didn't appear to calculate as we expected. We assumed that we could multiply Net Sales
(column E) with Royalty Rate (column G) to arrive at Royalty Due (column H).

In many of the rows that calculation works, but, in some of the rows such as row 111, there is
a difference in what we have calculated vs. Reebok's calculation. We have labeled rows with a
difference as either "Low", where the Reebok calculation is less than expected, or "High"
where the Reebok calculation is more than expected.

Can you take a minute and review the spreadsheet to let us know if more information is
required to correctly calculate the royalty?

Thanks,


Matt Holdsworth CPA
Chief Financial Officer
CrossFit, Inc.
Matt.Holdsworth@CrossFit.com
928.710.2678



--
Matt Holdsworth CPA
Chief Financial Officer
CrossFit, Inc.
Matt.Holdsworth@CrossFit.com
928.710.2678

# CrossFit

Matt Holdsworth <matt.holdsworth@crossfit.com>

---

## April - June 2016 CF Royalty Statement

**Thornton, Craig** <Craig.Thornton@reebok.com>        Fri, Sep 23, 2016 at 1:38 PM
To: Matt Holdsworth <matt.holdsworth@crossfit.com>
Cc: "Gamble, Kenny" <Kenny.Gamble@reebok.com>

Hi Matt,

Sorry for the delay, holidays, and some craziness in our business caused the delay in this response. We reviewed the data this week and we confirm that it is accurate based upon our view of the contract. The confusion lies in the fact that we have agreed with your team that the net sales definition of the contract says that we will pay 50% of net sales value for ecommerce sales. This was reviewed back in February when Steve & Bruce were here in Canton.
  Attached is further details that show the sales by channel that will allow you to see how the calculation is being made.

Please feel free to call me next week should you have any questions.

Thanks,
Craig

**From:** Matt Holdsworth [mailto:matt.holdsworth@crossfit.com]
**Sent:** Tuesday, August 30, 2016 11:03 AM
**To:** Thornton, Craig
**Subject:** April - June 2016 CF Royalty Statement

Dear Craig,

[Quoted text hidden]

---

📄 **Q216 CFHQ royalty data 080816.xlsx**
7842K

# **EXHIBIT C**

# CrossFit

Matt Holdsworth <matt.holdsworth@crossfit.com>

---

## Fwd:

Bruce Edwards  <bruce@crossfit.com>                                     Mon, Dec 19, 2016 at 1:45 PM
To: Matt Holdsworth <Matt.Holdsworth@crossfit.com>

Sorry, attached...

> Begin forwarded message:
>
> From:  "Gamble, Kenny" <Kenny.Gamble@reebok.com>
> Subject:  RE:
> Date: December 14, 2016 at 10:59:12 AM PST
> To: Bruce Edwards <bruce@crossfit.com>
>
> Bruce heres the 3rd party agreement and the 2nd extension proposal that we made to Steve. Let me
> know if you have any ques ons. Lets touch base on Monday. Thx
>
> ---
>
> From: Bruce Edwards [mailto:bruce@crossfit.com]
> Sent: Wednesday, December 14, 2016 12:27 PM
> To: Gamble, Kenny
> Subject: Re:
>
> Hi Kenny
>
> Yes confirmed this is my email address
>
> - Bruce
>
>
> On Dec 14, 2016, at 9:22 AM, Gamble, Kenny <Kenny.Gamble@reebok.com> wrote:
>
>> Bruce, just confirming this is your official email address before I send you these
>> documents.

---

2 attachments

📄 CrossFit Agreement  - 3rd Party Online Commissions.docx
18K

📄 Reebok-CrossFit Contract T  erm Sheet (revised).docx
74K



## Contract Key Business Terms

**Term**

January 1, 2017 – December 31, 2025

**Territory**

Global

**CrossFit Games**

- Reebok designated as title sponsor of the CrossFit Games season consistent with existing contract for the 2017 and 2018 Games
- Title sponsorship identification and branding rights for that period consistent with existing contract
- Beginning with 2019 CrossFit Games, Reebok will be designated as the "Exclusive/Authentic/Official Outfitter of CrossFit and the CrossFit Games" or some reasonable variation thereof
- CrossFit may obtain third party title sponsorship beginning with the 2019 CrossFit Games, provided that such title sponsor may not be a Reebok Competitor
- At all times, Reebok will be the exclusive provider of all competing athlete footwear, apparel, and accessories for CrossFit Games season consistent with existing contract
- Reebok will retain the specific sponsorship rights set forth in Sections  4.3 of the existing contract, revised to reflect the change in designation beginning with the 2019 CrossFit Games
- CrossFit obligations for marketing and branding of Reebok and Reebok CrossFit product at CrossFit's expense, subject to Reebok approval:
  - In broadcast integration
    - Graphics (exhibit to be created demonstrating branding)
    - On-air mentions (exhibit to be created demonstrating frequency/type)
  - In venue integration
    - Branding (exhibit to be created demonstrating branding)
    - Vignettes (exhibit to be created demonstrating branding)
    - Announcement (exhibit to be created demonstrating frequency/type)
    - Retail (exhibit to be created demonstrating branding)
- Reebok's sponsorship obligations for cash sponsorship fee, prize purse and athlete outfitting:

| Term Year | Cash Sponsorship Fee | Games Prize Purse | Games Season Athlete Outfitting* (Retail Value) |
|-----------|---------------------|-------------------|------------------------------------------------|
| 2017 | $2,000,000 | $2,400,000 | $3,000,000 |
| 2018 | $2,350,000 | $2,600,000 | $3,000,000 |
| 2019 | N/A | N/A | $3,000,000 |
| 2020 | N/A | N/A | $3,000,000 |
| 2021 | N/A | N/A | $3,000,000 |

Confidential – For Discussion Purposes Only



| | | | |
|---|---|---|---|
| 2022 | N/A | N/A | $3,000,000 |
| 2023 | N/A | N/A | $3,000,000 |
| 2024 | N/A | N/A | $3,000,000 |
| 2025 | N/A | N/A | $3,000,000 |
| **Totals** | **$4,350,000** | **$5,000,000** | **$27,000,000** |
| **Total Value** | **$36,350,000** | | |

\*Reebok will meet Games' Athlete's needs.  The value assigned to this outfitting is an approximation and the actual value of the outfitting could be more or less than this amount in any given year.

## Licensed Product

- .CrossFit grants global rights to Reebok to use CrossFit trademarks for Men's, Women's and Youth performance and lifestyle Footwear, Apparel, Accessories consistent with existing contract
- .License product exclusivity consistent with existing contract
- .Compliance consistent with existing contract

## License Product Royalties

- 11% across all licensed product – footwear, apparel, accessories
- Royalty calculated at adidas Group Net Sales Definition:
- 
  - **Net Sales"** means "Net Sales Wholesale" plus "Net Sales Own Retail and Online".
  - "Net Sales Wholesale" means the gross revenues in U.S. dollars from all sales of Licensed Products as invoiced by LICENSEE (or its affiliates and sub-licensees, each to the extent permitted hereunder) to third party customers, and reduced only by excise or indirect taxes (e.g. VAT and turnover taxes), returns as credited to third party customers, usual cash, trade and sales discounts and allowances, insurance and freight out (if invoiced separately)  "Net Sales Wholesale" does not include "Net Sales Own Retail and Online" and sales to the WCH Entities or their affiliates.
  - "Net Sales Own Retail and Online" means 50% of the gross revenues received from all sales of Licensed Products by LICENSEE or its affiliates to consumers via own-retail (whether in a physical store or online) and reduced only by discounts, rebates, excise or indirect taxes (e.g., VAT and turnover taxes) and returns.

| Term Year | Minimum Royalty Guarantee |
|---|---|
| 2017 | $6,200,000 |

Confidential – For Discussion Purposes Only



| | |
|---|---|
| 2018 | $6,800,000 |
| 2019 | $7,200,000 |
| 2020 | $7,500,000 |
| 2021 | $7,800,000 |
| 2022 | $8,200,000 |
| 2023 | $8,500,000 |
| 2024 | $8,800,000 |
| 2025 | $9,200,000 |
| **Total** | **$70,000,000** |

## Marketing

- Reebok Marketing Commitment and related CrossFit approvals (Sections 8.5 and 8.6 of existing contract) will be removed
- CrossFit CRM Data
  - Reebok receives access to, and marketing rights for, all existing and future CrossFit CRM data (CrossFit ID and CrossFit store)
- Video Content Production:
  - CrossFit produces 1 Reebok CrossFit specific product focused video per quarter
  - CrossFit distributes through all their media channels (CF and CF Games websites and social media channels)
  - Reebok briefs CrossFit on video deliverables
- Content Distribution:
  - CrossFit posts or re-posts Reebok Brand and/or Reebok CrossFit product content through all of their social media channels (CrossFit and CrossFit Games) a minimum of 2x per week (exhibit to be created with yearly activation calendar)
- Banners:
  - CrossFit.com and Games.CrossFit.com

## Co-Branded Gyms

- Reebok has rights, but no obligation, to offer co-branded Reebok CrossFit gym license to select CrossFit affiliates in mutually agreed upon key cities
- Intent is to create flagship locations for Reebok and CrossFit to grow respective brand awareness (e.g. retail store, CrossFit seminars, media hubs)
- Co-branded gym licensing terms consistent with existing contract, including prohibition on competitor-branded gyms but excluding specific funding requirements

## CrossFit Store

Confidential – For Discussion Purposes Only



- .Reebok may maintain operation of CrossFit Store for duration of contract; provided, however, that if Reebok wishes to relinquish control of the CrossFit Store to CrossFit it may do so upon [12] months' notice to CrossFit of its intent to do so
- .Reebok will make commercially reasonable efforts to develop CrossFit Store functionality to ship to key countries outside of North America
- .Reebok agrees to sell select CrossFit branded 3rd. party merchandise (e.g. coffee mugs, posters, etc.).
  - o  .Merchandise assortment agreed upon on a quarterly planning basis
  - o  .25% royalty paid of Net Sales paid to CrossFit on 3rd. party items

**CrossFit Seminar/SME Staff and Participant Support**

- Reebok agrees to support CrossFit Seminar Staff, SME Staff and CrossFit Level 1 Seminar Participants with co-branded Reebok CrossFit product.  Reebok will create and deliver outfitting packages to meet this support obligation.  The value of such packages is expected to be as follows:

| Term Year | Seminar Staff Outfitting (Retail Value) | SME Staff Outfitting (Retail Value) | CrossFit L1 Seminar T-Shirts (Retail Value) |
|---|---|---|---|
| 2017 | $750,000 | $75,000 | $525,000 |
| 2018 | $750,000 | $75,000 | $525,000 |
| 2019 | $750,000 | $75,000 | $525,000 |
| 2020 | $750,000 | $75,000 | $525,000 |
| 2021 | $750,000 | $75,000 | $525,000 |
| 2022 | $750,000 | $75,000 | $525,000 |
| 2023 | $750,000 | $75,000 | $525,000 |
| 2024 | $750,000 | $75,000 | $525,000 |
| 2025 | $750,000 | $75,000 | $525,000 |
| **Totals** | **$6,750,000** | **$675,000** | **$4,725,000** |
| **Total Value** | **$12,150,000** | | |

**CrossFit HQ Staff Support**

- Reebok agrees to support CrossFit employees with co-branded Reebok CrossFit product.  As above, Reebok will create and deliver outfitting packages to meet this support obligation.  The value of such packages is expected to be as follows:

Confidential – For Discussion Purposes Only



| Term Year | Seminar Staff Outfitting (Retail Value) |
|-----------|------------------------------------------|
| 2017 | $300,000 |
| 2018 | $300,000 |
| 2019 | $300,000 |
| 2020 | $300,000 |
| 2021 | $300,000 |
| 2022 | $300,000 |
| 2023 | $300,000 |
| 2024 | $300,000 |
| 2025 | $300,000 |
| **Totals** | **$2,700,000** |

**Corporate Responsibility**

- .Reebok agrees to remove requirement for CrossFit to fund "Reebok Charity" per section 8.7 of existing contract

**Trademark Portfolio**

- CrossFit will update Reebok on the status of its global trademark portfolio and highlight any outstanding registration problems and will undertake as soon as reasonably possible to obtain registrations for the CrossFit marks in Class 25 in countries/markets where the parties expect to sell CrossFit branded products

Confidential – For Discussion Purposes Only

# EXHIBIT D



# Reebok CrossFit Agreement – Net Sales Definition

All royalties due CrossFit as set forth in Section 9 shall be collectively referred to as "Royalties". Royalties hereunder shall accrue when the Licensed Products are sold.

For the purpose of this provision, "Net Sales" shall mean the invoiced selling price of the Licensed Products solely less (i) actual and documented customer returns and taxes, and (ii) chargebacks solely related to the Licensed Products taken in the normal course of business and which are separately stated on an invoice or credit memo. There shall be no other deductions allowed, including deductions for manufacturing costs, selling costs, distribution costs, advertising and promotional costs, freight (unless listed on the invoice), non-collected or uncollectible accounts, commissions, cash discounts, sales to employees or any other costs.

**There is a difference of opinion on what constitutes "invoiced selling price" for Own Retail / eCom**
- **Reebok – 50% of Net Sales**
- **CFHQ – full Net Sales**

# Reebok CrossFit Royalty Payment Reconciliation Summary

Actual royalty payments have been made by calculating royalty at ½ the net sales for the eCom channel

| Year | Royalty on Full Net Sales for eCom | Actual Royalty Payment Made | Variance due to eCom royalty calculation |
|------|------|------|------|
| 2013 | $ 3,729,630 | $ 3,429,247 | $ (300,383) |
| 2014 | $ 7,345,578 | $ 6,621,518 | $ (724,060) |
| 2015 | $ 7,911,391 | $ 7,862,447 | $ (48,944) |
| 2016 Q1-Q3 | $ 5,288,950 | $ 4,709,046 | $ (579,904) |

Total  $  (1,653,291)

Resulting in a payment shortfall of $1.65M

Reebok △  CrossFit Net Sales @ Act. Average Exchange Rate ($), all values in 000's
CONFIDENTIAL. For internal use only.

3

# Reebok CrossFit Royalty Payment Reconciliation Summary

Changes in enterprise systems resulted in overpayments against CrossFit + Kevlar products

| Year | Royalty on Full Net Sales for eCom | | Actual Royalty Payment Made | | Variance due to eCom royalty calculation | | Variance due to incorrect royalty rate on CrossFit + Kevlar product | |
|---|---|---|---|---|---|---|---|---|
| 2013 | $ | 3,729,630 | $ | 3,429,247 | $ | (300,383) | $ | - |
| 2014 | $ | 7,345,578 | $ | 6,621,518 | $ | (724,060) | $ | - |
| 2015 | $ | 7,911,391 | $ | 7,862,447 | $ | (48,944) | $ | 914,038 |
| 2016 Q1-Q3 | $ | 5,288,950 | $ | 4,709,046 | $ | (579,904) | $ | - |
| Total | | | | | $ | (1,653,291) | $ | 914,038 |

Resulting in an overpayment of $914K

Reebok ▲   CrossFit Net Sales @ Act. Average Exchange Rate ($), all values in 000's
CONFIDENTIAL. For internal use only.

4

# Reconciliation: CF + Kevlar Overpayment

| QTR | Key Year | Product Division | Article | Article Name | Brand Asset (Priority) | Royalty Rate |
|---|---|---|---|---|---|---|
| Q4 | 2015 | APPAREL | B84642 | RCF KEVLAR SS TEE | CF & KEVLAR | 10% |
| Q4 | 2015 | APPAREL | B84642 | RCF KEVLAR SS TEE | CF & KEVLAR | 10% |
| Q4 | 2015 | APPAREL | B84642 | RCF KEVLAR SS TEE | CF & KEVLAR | 10% |
| Q3 | 2015 | APPAREL | B84643 | RCF KEVLAR COMP SHORT | CF & KEVLAR | 10% |
| Q3 | 2015 | APPAREL | B84643 | RCF KEVLAR COMP SHORT | CF & KEVLAR | 10% |
| Q3 | 2015 | APPAREL | B84643 | RCF KEVLAR COMP SHORT | CF & KEVLAR | 10% |
| Q3 | 2015 | APPAREL | B84643 | RCF KEVLAR COMP SHORT | CF & KEVLAR | 10% |
| Q3 | 2015 | APPAREL | B84643 | RCF KEVLAR COMP SHORT | CF & KEVLAR | 10% |
| Q3 | 2015 | APPAREL | B84643 | RCF KEVLAR COMP SHORT | CF & KEVLAR | 10% |
| Q4 | 2015 | APPAREL | B84643 | RCF KEVLAR COMP SHORT | CF & KEVLAR | 10% |
| Q4 | 2015 | APPAREL | B84643 | RCF KEVLAR COMP SHORT | CF & KEVLAR | 10% |
| Q4 | 2015 | APPAREL | B84643 | RCF KEVLAR COMP SHORT | CF & KEVLAR | 10% |
| Q4 | 2015 | APPAREL | B84643 | RCF KEVLAR COMP SHORT | CF & KEVLAR | 10% |
| Q3 | 2015 | APPAREL | B84643 | RCF KEVLAR COMP SHORT | CF & KEVLAR | 10% |
| Q3 | 2015 | APPAREL | B84643 | RCF KEVLAR COMP SHORT | CF & KEVLAR | 10% |
| Q4 | 2015 | APPAREL | B84643 | RCF KEVLAR COMP SHORT | CF & KEVLAR | 10% |
| Q3 | 2015 | FOOTWEAR | M49797 | R CROSSFIT NANO 5.0 | CF & KEVLAR | 10% |
| Q3 | 2015 | FOOTWEAR | M49797 | R CROSSFIT NANO 5.0 | CF & KEVLAR | 10% |

Due to a enterprise system change in Q3 & Q4 of 2015, royalties for CrossFit products produced with Kevlar were calculated at 10% stemming from the combination *Brand Asset* code

Reebok △   CrossFit Net Sales @ Act. Average Exchange Rate ($), all values in 000's
CONFIDENTIAL. For internal use only.

# Reebok CrossFit Royalty Payment Reconciliation Summary

Combining the eCom calculation change and the CrossFit + Kevlar correction results in a payment of $739K

| Year | Royalty on Full Net Sales for eCom | Actual Royalty Payment Made | Variance due to eCom royalty calculation | Variance due to incorrect royalty rate on CrossFit + Kevlar product | Total variance |
|---|---|---|---|---|---|
| 2013 | $ 3,729,630 | $ 3,429,247 | $ (300,383) | $ - | $ (300,383) |
| 2014 | $ 7,345,578 | $ 6,621,518 | $ (724,060) | $ - | $ (724,060) |
| 2015 | $ 7,911,391 | $ 7,862,447 | $ (48,944) | $ 914,038 | $ 865,094 |
| 2016 Q1–Q3 | $ 5,288,950 | $ 4,709,046 | $ (579,904) | $ - | $ (579,904) |
| Total | | | $ (1,653,291) | $ 914,038 | $ (739,253) |

**Reebok △**  CrossFit Net Sales @ Act. Average Exchange Rate ($), all values in 000's
CONFIDENTIAL. For internal use only.